UNITED STATES, Appellant,

v.

Angeline ROAN EAGLE, Appellee.

No. 87–5437.

United States Court of Appeals,
Eighth Circuit.

Submitted June 17, 1988.

Decided Jan. 18, 1989.

Certiorari Denied April 17, 1989.
See 109 S.Ct. 1764.

Dennis H. Hill, Rapid City, S.D., for appellant.

Robert A. Mandel, Asst. U.S. Atty., Rapid City, S.D., for appellee.

Before LAY, Chief Judge, BROWN, Senior Circuit Judge, and BEAM, Circuit Judge.

JOHN R. BROWN, Senior Circuit Judge.

Angeline Roan Eagle and Georgianna Brave were charged, in a single indictment, with first degree murder for the killing of Roland Belt. Because all three were American Indians and the crime took place on an Indian reservation, federal jurisdiction exists under 18 U.S.C. § 1153.[1]

Brave pleaded guilty to voluntary manslaughter, 18 U.S.C. § 1112, which carries a maximum 10 year sentence. As a part of the plea agreement she testified against Roan Eagle. Subsequently, Brave was sentenced to 10 years' imprisonment. Roan Eagle was convicted of second degree murder and sentenced to 20 years' imprisonment.[2]

Roan Eagle appeals, contending that the trial court erred in (i) allowing the prosecution to exercise a peremptory challenge as to prospective juror French, the only Indian venireman, (ii) allowing the prosecution to examine Brave and FBI agent Davis concerning a prior unsworn statement Brave made to Davis, (iii) limiting the defense's efforts to inquire into Brave's plea bargain, (iv) admitting certain statements under the excited utterance hearsay exception, and (v) refusing Roan Eagle's proposed jury instructions on intoxication and its negation of the specific intent to be an aider and abettor under 18 U.S.C. § 2.[3]

We affirm.

### The Evils of Strong Drink in a Family Gathering

Roland Belt was killed during what started out as a family social gathering but ended in bloodshed hours later. Belt, Brave, Roan Eagle, and other participants had been drinking throughout the evening. Brave's sixteen-year-old son Richard Little was among those present at the gathering, but according to his own account had *not* been drinking.

Little later testified that when Roland Belt got up to leave shortly before 4:00 AM, he and his niece Georgianna Brave began arguing. Brave then started hitting Belt, and Roan Eagle soon joined in. All three fell to the floor during the fighting. A momentary lull in the struggle then occurred, during which Brave went to the kitchen and returned with a knife. Brave stabbed Belt in the upper body a number of times, then dropped the knife and went

---

1. 18 U.S.C. § 1153 provides in pertinent part:
 Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, ... shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States.

2. 18 U.S.C. § 1111 provides:
 (a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnaping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated de-

 sign unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree. Any other murder is murder in the second degree.
 (b) Within the special maritime and territorial jurisdiction of the United States,
 Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto 'without capital punishment', in which event he shall be sentenced to imprisonment for life;
 Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life.

3. 18 U.S.C. § 2 provides in pertinent part:
 (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

back to the kitchen to wash blood off her jacket. Roan Eagle then picked up the knife and began stabbing Belt repeatedly in the chest.[4]

Sometime afterward, the police were called. Officer James Yellow Boy was the first to arrive. He later testified that Little waved down Yellow Boy's patrol car and told him that "[m]y mother stabbed [Belt]." About an hour had elapsed since the stabbing, according to the government. At the time, Little was crying. Yellow Boy then went to check Belt's body, which was just inside the front doorway. More or less contemporaneously, he overheard Brave drunkenly bragging that she had stabbed Belt. Yellow Boy arrested Brave. Little—

still crying—then approached Yellow Boy and volunteered that "[m]y mom, along with my aunt [Roan Eagle], stabbed [Belt]." Little also told Yellow Boy that the murder weapon was a "brown-handled butcher knife, with the blade curved upward."

Officer George Twiss arrived about 4:30 or 4:35 a.m. About 15 minutes after his arrival, Twiss questioned Little.[5] Sergeant Frank Martinez arrived at 4:36 a.m. He checked Belt's body for himself, and then talked with Little, although briefly.[6]

### How Long Does Excitement Last?

The officers' testimony as to Little's statements to them was admitted under the

4. Little also testified on direct examination that he never hit Belt that night or otherwise got involved in the fight. On cross-examination, the following exchange took place:

> Q: At the time that you were watching this fight going on between your mother [Georgianna Brave] and Roland [Belt], did you do anything to step in and try and stop the fight?
> A: You mean—yeah, I tried, but my mom told me to—if I stop that, I was supposed to get out of her life.
> . . .
> Q: Where were you when she said that?
> A: I was trying to get away from [Belt].
> Q: What do you mean you were trying to get away from [Belt]?
> A: I was trying to get my Mom away from [Belt].
> Q: And how were you doing that?
> A: Pulling her arms.
> Q: At the time you were doing that, what was she doing?
> A: She was trying to get away from me.

Roan Eagle herself testified that Little struck Belt upon the head with an object at some point in the fray. A lump was indeed found on Belt's head during the autopsy. A forensic pathologist testified in his opinion the injury that caused the lump had occurred "within a day or so" before Belt died. Little asserted that that lump was a result of a car accident which had occurred a "long time" prior to the night of Belt's death.

5. He testified that at the time, Little "seemed hysterical, but he was lucid. He seemed to get his facts straight. He wasn't jumping around in the order of what he was telling me." He was asked about observable signs of Little's emotional state, and responded that the only such signs were his "shifting his feet, looking round, speaking rapidly."

On direct examination, Twiss related the content of Little's statement:

> He said [Belt] had been stabbed by [Brave] and [Roan Eagle].... He said they had been arguing and drinking, and that [Brave] had hollered at [Belt], something about, "[y]ou raped my daughter...." [Belt] was trying to leave the residence. As he went toward the door, he was attacked by the two women—stabbed.... I believe he said [Brave] was the one that first stabbed [Belt].... He said they followed [Belt] around the living room, stabbing him, cussing—or kicking and cussing at him, hitting him, until he finally fell down by the bannister next to the front door.... And he said afterwards, they were still mad and stomping around, hollering. And he tried to help [Belt] up, but he couldn't get him up.... He said that the last one to stab [Belt] was [Roan Eagle] and she had the knife, the last time he saw it.... He said he was afraid and he was afraid of them and afraid for [Belt]. So he ran back toward the residence. As he came in the front door, [Roan Eagle] and [Brave] were dragging [Belt] towards the front door. When they saw him [Little], they stopped.... [Little's] exact words were: after [Belt] had fallen by the bannister, he tried to help him up. He couldn't get him up.

On cross-examination, Twiss testified that Little had still been "upset," "agitated," "excited," and "crying" when, close to daybreak, the search of the crime scene was finally concluded and Twiss took Little to stay with Little's grandmother Sara Brave.

6. Martinez testified that "[a]t times [Little] was distraught and crying, and then talking, and then became distraught again.... [H]e informed me that [Brave] and [Roan Eagle] were at the residence; that they had some type of dispute over an incident several years ago; and at that time Mr. Belt had been stabbed.... [Little] informed me that both women had stabbed [Belt]."

excited utterance exception to the hearsay rule, F.R.Evid. 803(2).[7]

A subsequent autopsy determined that Belt died as a result of multiple stab wounds. Brave and Roan Eagle were both charged with first degree murder. Brave pleaded guilty to voluntary manslaughter, 18 U.S.C. § 1112, and agreed to testify against Roan Eagle.

### Keeping the Jury in the Dark

Before Roan Eagle's trial, the prosecution raised the question of the extent to which the defense would be permitted to reveal to the jury the details of the Brave's plea bargain. The court ruled that in assaying Brave's credibility the jury could be made aware of (i) the charge in the indictment, (ii) her cooperation with the prosecution, and (iii) the fact that she was allowed to plead guilty to a lesser charge: but the court expressly prohibited any inquiry into (i) the specific lesser charge (manslaughter) to which she pleaded, or (ii) the sentence to which she was exposed, or might receive. The court also elected to defer sentencing Brave until it had heard "what the total facts are as brought out in [Roan Eagle's] case."

### An Indian Venireman Excluded

During jury selection, the prosecution exercised a peremptory challenge to strike prospective juror French, the only Indian venireman. In response to Roan Eagle's charge that the peremptory was racially motivated and in violation of *Batson v. Kentucky,* the prosecution recited three reasons which were accepted by the trial court as racially neutral and adequate to justify the peremptory.

### Hearsay from the FBI

At trial, the prosecution called Brave, and asked her if she recalled speaking to an FBI agent the day after Belt was killed. Brave responded affirmatively, but elaborated that she told the agent that she didn't

remember anything that had happened the previous night after a relatively early point in the evening, before the altercation began. On cross-examination, in conformity with the court's pretrial ruling, the defense could not and did not inquire about Brave's sentence or the specific reduced charge to which Brave pleaded or the potential sentence she knew might be imposed.

FBI Agent Davis then testified that during their interview, Brave initially denied having any recollection about the stabbing of Belt, but subsequently admitted remembering the stabbing. He testified that Brave had then given a "somewhat detailed statement" of the facts surrounding that stabbing, which included an explanation of when and how it had occurred. He did not relate the content of that statement to the jury, quote Brave's words, or otherwise elaborate. This was the entire substance of Davis' testimony.

Roan Eagle was convicted of second degree murder and sentenced to 20 years' imprisonment. Brave was sentenced to 10 years' imprisonment, the maximum penalty for voluntary manslaughter.

Roan Eagle appeals, contending that the trial court erred in the five particulars previously stated.

### Many Are Chosen, Few Shall Serve, (More Are Struck)

■ *Batson v. Kentucky* requires that when a defendant makes a prima facie showing that the prosecution has exercised its peremptory challenges in a racially discriminatory fashion by peremptorily challenging jurors of a particular race, the prosecution must then come forward with a racially neutral explanation to justify the challenge. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

A prima facie case is established when the defendant can show that "he is a member of a cognizable racial group, ... and that the prosecutor has exercised peremp-

---

7. Federal Rule of Evidence 803(2) provides:
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness: ... (2) *Excited utterance.* A state-

 ment relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

tory challenges to remove from the venire members of the defendant's race." *Batson*, 476 U.S. 79, 96, 106 S.Ct. 1712, 1713, 90 L.Ed.2d 69, 87 (citations omitted).

First, both French and Roan Eagle are American Indians. This is a recognized minority group for purposes of a *Batson* inquiry. *United States v. Chalan*, 812 F.2d 1302, 1314 (10th Cir.1987).

Second, citing *United States v. Porter*, the Government argues that Roan Eagle "woefully" failed to make a prima facie case. *United States v. Porter*, 831 F.2d 760 (8th Cir.1987). We do not agree. *Porter* found no prima facie case when one of two black veniremen was struck. One black venireman, however, remained and served on the jury. In the case of Roan Eagle, there was one potential American Indian juror and that juror was struck.

Other circuits have developed this area of the *Batson* inquiry along similar lines. The Third Circuit found that a prima facie case existed when the only two black veniremen were struck. *United States v. Clemons*, 843 F.2d 741 (3rd Cir.1988).[8]

The Tenth Circuit has gone further and determined that whenever the government strikes all members of the defendant's race, a prima facie *Batson* case has been made. *Chalan*, 812 F.2d 1302, 1314 (10th Cir.1987.)

As we see it, it is the prosecution that, by arguing that there was no prima facie case, has "woefully" failed. We therefore conclude that a *Batson* inquiry into the striking of the juror was called for.

■ A *Batson* inquiry next raises the procedural question as to how the judge is to handle the inquiry. Essentially, is the Judge required to hold an evidentiary hearing or some sort of mini-trial on the merits of the claim?

On the whole, we think not. In a recent decision, Judge Butzner, for the Fourth Circuit, wrote that the defendant-appellant's

insistence on an evidentiary hearing in which the prosecutors and defense attorneys and possibly other witnesses would be examined and cross-examined misconceives the *Batson* inquiry.... *Batson* does not require this intrusion on the trial proceedings....*Batson* requires the prosecutor to "articulate a neutral explanation related to the particular case ..."

*United States v. Garrison*, 849 F.2d 103, 106 (4th Cir.1988) (citations omitted).

Therefore "If the trial court believes the prosecutor's explanation, a reviewing court ordinarily should give this credibility finding 'great deference.' " *Id.*

The nature of the inquiry, although adversarial, does not rise to the level of a mini-trial. Rather, in the context of the *Batson* inquiry, once the prosecutor has advanced his racially neutral explanation, the defendant should have the opportunity to rebut with his own interpretation.

■ This, however, need not necessarily be a lengthy process. If the trial judge is able to reach a determination on the basis of a short exchange between prosecutor and defense then that is the trial court's perogative. The scope of our review is restricted to a determination of whether the trial court was "clearly erroneous" in its factual basis and had a reasonable basis for concluding that the prosecutor's explanation was racially neutral.

■ In support of its challenge, the prosecution stated three reasons for striking French: (i) French had been on a prior jury that had acquitted another criminal defendant, (ii) the prosecutor's independent recollection was an individual convicted in an unrelated case was French's brother, and (iii) his assessment that French was "slovenly" and accordingly would not "be a good juror for the prosecution."

In rebuttal, Roan Eagle urged that: (i) the government did not strike another, white, juror who had also served on the same prior jury as French, (ii) the govern-

---

**8.** The *Clemons* Court was careful, however, not to advocate a "magic number" or brightline rule in regards to establishing a prima facie case.

ment offered only hazy and unsubstantiated evidence based on personal recollection that French had a brother who had been convicted of a crime and thus did not meet the requirement that there must be "clear support in the record" for the government's explanation, *Garrett v. Morris*, 815 F.2d 509, 513 (8th Cir.1987), and (iii) that the government's subjective reaction to the dress and manner of French was essentially racist.

There is precedent for the striking of a juror for prior service on a jury that acquitted and for striking a juror because of a close family relationship to a convicted criminal. *United States v. Thompson*, 827 F.2d 1254, 1260 (9th Cir.1987) ("Excluding jurors because ... they acquitted in a prior case ... is wholly within the prosecutor's privilege."); *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir.1987) ("The appellants admit that the prosecutor supplied an objective explanation for striking the black woman whose two sons had been in trouble with the law."). Finally, the argument that French was perhaps hostile or unfriendly to the prosecution based on the subjective evaluation of French's dress and mannerisms is precisely the reason why peremptory challenges exist. Admittedly, there is a fine distinction between disguised racism and prosecutorial privilege based on subjective evaluation, but if peremptory challenges are to continue, we follow precedent to award substantial leeway to the prosecutor's privilege.

Unable to second guess the trial court and substitute our judgment for his, we find that Roan Eagle's Constitutional rights were not violated by the striking of French from the jury.

## Mixing Confrontation and Hearsay

■ Roan Eagle contends that the examination of Georgianna Brave and FBI Agent Davis constituted prosecutorial misconduct. Roan Eagle claims that it denied her her right of confrontation of the witnesses, and allowed in inadmissible hearsay.[9] We do not agree.

In regard to Roan Eagle's hearsay objection to the questions that were asked of Brave about her prior statement, this did reveal some details of that statement, but only to the extent necessary to attempt to prod Brave in the face of her claimed loss of memory. Moreover, all those details related solely to Brave herself, except those revealed in the question that provoked the hearsay objection from Roan Eagle's counsel. The objection was sustained and the jury was instructed to disregard the question and answer.

In the absence of any indication that the jurors failed to follow that instruction, it is clear that Roan Eagle suffered no loss of her Sixth Amendment right of confrontation. The only Sixth Amendment right of cross-examination related to Brave's asserted inability to recall making a statement, and Davis' basis for asserting that Brave did make a statement. Roan Eagle was not denied those opportunities for cross-examination.

We find no basis for Roan Eagle's attack on this issue.

## Keeping the Jury in the Dark

■ Roan Eagle claims that the trial court erred in forbidding her to cross-examine Brave about the details of her plea bargain to essentially establish what re-

**9.** Georgianna Brave was asked the question "[d]o you remember telling the FBI agent that Angeline Roan Eagle started hitting and kicking Roland Belt?" R. 292. Before Brave could answer, Roan Eagle objected to the question on the grounds that it was hearsay. The court then recessed the jury and held a conference in chambers. After hearing the arguments of both counsels, the court upheld the objection. R. 292–301. The trial court subsequently instructed the jury to disregard the question. R. 316–17.

After the objection was sustained at the conference, Roan Eagle moved for mistrial on the grounds that the jury had been irretrievably prejudiced by the prosecution's question. At this point, the trial court said:

I do concur with defense counsel's understanding, and that was that the court was supposed to be advised of this before you ask the question so that we could resolve this in chambers.

R. 312. The trial court found that the jury had not been prejudiced and that the incident did not rise to the level of a mistrial.

mains a startling uncontradicted fact: that Brave pleaded guilty to voluntary manslaughter which she had to know carried a maximum sentence of ten years in contrast to a potential lifetime sentence.

The decision of the trial court was not made in the heat of the trial or under circumstances leaving little opportunity for reflection. On the contrary, and reflecting the trial Judge's long-held convictions, the determination was made at a hearing on July 31, 1987. The trial Judge was emphatic:

> I have consistently held in these types of cases, consistent by an experience, I think, of 3 [of such cases], that the fact that she has offered favorable treatment is relevant, and the fact that she has agreed to cooperate is relevant, and that as a result of a plea bargain, which gave her the opportunity to enter a plea to guilty to a reduced charge, *but I do not open up what the charge she plead to.* I have no objection to having the record indicate that she was charged with first degree murder. And that that was the indictment. She was indicted for first degree murder. And that in return for her cooperation, *she entered a plea to a lesser charge. Her sentence is not to be admitted, nor the charge she actually plead to.*

(R. 27, 28). (emphasis added)

What is behind the trial Judge's long-time practice is not shrouded in mystery or undisclosed by the anonymity of the Judge's robe. What the Judge was consciously worried about was the likelihood—indeed, the probable certainty—that the jury, learning that Brave who was by all counts as guilty as Roan Eagle, would get a maximum of a ten-year sentence while Roan Eagle faced the specter of a Judge-imposed sentence up to life. Within the leeway between first degree murder, second degree murder and manslaughter which the court had severally to submit to the jury, the jury would likely select the crime under the Judge's charge which would result in a like punishment.

When the stakes are so high and the credibility of the one-time associate-in-crime is acutely involved, the accused is entitled as a matter of right to effective cross-examination. This includes not only the specific crime to which the co-actor is pleading guilty, but the range of punishment to which the one pleading guilty is exposed to in contrast to what that person knows—or ought to know—is the potential sentence for a conviction following a plea of not guilty.

Had Brave really been in fact a witness —as the Judge had to assume she would be when he ruled in July—her testimony would be subject to the most vigorous attack on credibility. Having to acknowledge that she had pleaded guilty to a charge of manslaughter, she had to know from Rule 11 proceedings that the maximum sentence to which the court could sentence her was ten years. More than that, she would have to acknowledge that unlike the maximum of ten years under her negotiated plea, she would have been exposed to a life-time sentence under the indicted charge of murder. To save herself from years up to life, she could plead guilty and assure a maximum of ten years. What greater inducement or incentive could there be for one confronted with that prospect to eliminate all doubts and risks by a plea of guilty to a known lesser offense so that such person could carry out the plea agreement to testify affirmatively against the former co-defendant.

█ We are of the positive conclusion that the trial judge's decision is clearly wrong. The details of a plea can be highly relevant to a jury in assessing the credibility of a guilty-pleading co-defendant who has taken the stand to testify for the prosecution. This is especially true if that witness has not yet been sentenced as there is a continuing incentive to give testimony that strengthens the prosecution's case. *Campbell v. Reed*, 594 F.2d 4, 7 (4th Cir. 1979) ("The fact that Miller was not aware of the exact terms of the plea agreement only increases the significance, for purposes of assessing credibility, of his expectation of favorable treatment.").

█ When a witness who has entered into a plea agreement and, as contemplated

in the plea agreement, takes the stand to give evidence against a co-defendant, the credibility of that witness is highly relevant. To constitute effective cross-examination, an advocate's inquiry into the terms of the agreement is essential. *Giglio v. United States*, 405 U.S. 150, 154–155, 92 S.Ct. 763, 766, 31 L.Ed.2d 104, 109 ("Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.").

■ Despite the fact that we have enunciated a rule that would seem to lead us to hold for Roan Eagle, this is a situation where the credibility of Brave was not really an issue. Brave's testimony did not incriminate Roan Eagle in any way. Brave's professed amnesia about the events of that night, was testimony, no matter how "pleasing" to the prosecutor, which could not have led the jury to any conclusion about the guilt of Roan Eagle.

We, therefore, conclude that although the trial court patently erred, the error was harmless.

### A Matter of Hearsay

■ Regarding the statements made by Little to various police officers which were then admitted under the excited utterance exception to the hearsay rule, we find that any error that occurred, if any, was harmless.

The trial court allowed in the second statement [10] as an excited utterance exception to the hearsay rule. The first statement [11] was apparently admitted not as an excited utterance but as a Rule 602 exception to necessity of personal knowledge.[12] We see no reason why the first, as the second, of these utterances or statements were not admissible.

One can argue that by allowing these statements in under different rules and by limiting the first statement as the trial Judge did to Rule 602, Roan Eagle was denied the ability to effectively cross-examine Little about the varying content of these two statements. Elaborating on this, Roan Eagle argues that the effect of allowing in the statements as well as putting Little on the stand to testify was to bolster the testimony of Little, presumably on the theory that if something is repeated often enough, the jury will believe it even if it is not true.

Whether the trial court erred in receiving the first statement as an excited utterance or simply under Rule 602, we need not decide. Little took the stand himself and, subject to cross-examination, stated that both his mother and aunt stabbed Belt.[13] Any error in admitting the statements as excited utterance (or under Rule 602) is harmless.

We therefore uphold the trial court's ruling.

### Aider and Abettor Specific Intent Required?

■ The final issue raised on appeal is whether the trial court correctly instructed the jury on intent required for an aider and abettor.

Roan Eagle contends, on appeal, that aiding and abetting is a specific intent crime and that she was therefore entitled to have the jury so instructed.[14] The trial court

---

10. Yellow Boy said that Little approached him and said "my mom, along with my aunt, stabbed my grandpa [Belt]." R. 79.

11. That his mother had stabbed Belt. R. 74.

12. The trial court stated in a limiting instruction that the evidence was offered and accepted not as proof of the matter asserted, but merely to show what happened at a specific time, that is, that Little approached Yellow Boy at approximately 4:00 a.m. and made a statement. Without approval or disapproval, we conclude from this that the trial court admitted the statement as a Rule 602 exception to necessity of personal knowledge, not as an excited utterance.

13. R. 330.

14. Proposed Jury Instruction No. 3:
In order to be convicted of a crime on a theory of aiding and abetting, the aider and abettor must share the specific intent of the perpetrator. That is, an aider and abettor must know the full extent of the perpetrator's criminal purpose and give aid with the intent or purpose of facilitating the perpetrator's commission of the crime.

instructed the jury that first degree murder was a specific intent crime and that to be guilty of aiding and abetting first degree murder the requisite intent was also specific intent. The trial court, however, refused to instruct the jury that aiding and abetting was, itself, a specific intent crime and thus that the jury should acquit Roan Eagle of aiding and abetting second degree murder if they found she was intoxicated at the time.

■ We find that the trial court's jury instructions were correct. To be guilty of aiding and abetting is to be guilty as if one were a principal of the underlying offense. Aiding and abetting is not a separate crime but rather is linked to the underlying offense and shares the requisite intent of that offense.[15]

Roan Eagle does cite some seemingly contradictory language in previous decisions this circuit may have made on this point.[16] But long ago this court clearly stated "[g]enerally speaking, to find one guilty as a principal on the ground that he was an aider and abettor, it must be proven that he shared in the criminal intent of the principal...." *Johnson v. United States*, 195 F.2d 673, 675 (8th Cir.1952).

> If the intent of the aider and abettor is different from that of the perpetrator, the aider and abettor's guilt is measured by the intent that actuated him.
> Source: 21 Am.Jur.2d *Criminal Law* § 170, citing *People v. Beeman*, 35 Cal.3d 547, 199 Cal.Rptr. 60, 674 P.2d 1318 (1984).

**15.** The common formulation of the standard of proof for aiding and abetting is that the defendant "in some sort associate himself with the venture, that he participate in it as in something he wishes he bring about, [and] that he seek by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938), *United States v. Copple*, 827 F.2d 1182 (8th Cir.1987), *cert. denied* — U.S. ——, 108 S.Ct. 1046, 98 L.Ed.2d 1009.

Association has been interpretted to mean that "the defendant shared in the criminal intent of the principal, ... that is, the state of mind required for the statutory offense must be shown for conviction as an aider and abettor." *United States v. Beck*, 615 F.2d 441, 449 (7th Cir.1980) (citations omitted), *United States v. Smith*, 546 F.2d 1275 (5th Cir.1977).

**16.** *Compare United States v. Kelton*, 446 F.2d 669, 671 (8th Cir.1971) (In a conviction for bank

We do not find that this basic premise has been overturned by anything we have subsequently written.[17]

Although the language in *Kelton* might appear to be contradictory, the court was referring to specific intent *or* purposive attitude. The language indicates that there must be a knowing participation in the activity, not that one can only be guilty of aiding and abetting if one has the specific intent to aid and abet.

The trial court, therefore, did not err in instructing the jury as it did.

AFFIRMED.

BEAM, Circuit Judge, special concurrence.

I concur in the result reached in this matter. However, I do not agree with the majority discussion with regard to the requirements imposed upon trial courts by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Since this issue is presently before the court en banc in *United States v. Wilson*, No. 87–2280 (8th Cir. Dec. 8, 1988) (en banc), I will not burden this opinion with an exposition of my thoughts on the subject. Further, with regard to cross-examination of Georgianna Brave about her plea agreement, I do not

robbery, this court has found that "[t]he crime of aiding and abetting is one requiring 'specific intent' or ... 'purposive attitude'.), and *United States v. Hill*, 464 F.2d 1287 (8th Cir.1972) *with United States v. Bell*, 573 F.2d 1040, 1046 (8th Cir.1978) ("It would be anomolous to hold that specific intent was a necessary element of aiding and abetting a crime, but not of the crime itself."), *and United States v. Burkhalter*, 583 F.2d 389 (8th Cir.1978).

**17.** *See United States v. Grey Bear*, 828 F.2d 1286, 1292 (8th Cir.1987), ("we have previously observed that '[b]y far the most important element is the sharing of the criminal intent of the principal...."), *vacated on other grounds* 836 F.2d 1088; *United States v. Lard*, 734 F.2d 1290, 1298 (8th Cir.1984) (rehearing en banc denied), *United States v. Mansaw*, 714 F.2d 785, 792, n. 8 (8th Cir.1983) *cert. denied* 464 U.S. 986, 104 S.Ct. 434, 78 L.Ed.2d 366; *Snyder v. United States*, 448 F.2d 716, 719 (8th Cir.1971), *Mack v. United States*, 326 F.2d 481, 483 (8th Cir.1964) *cert. denied* 377 U.S. 947, 84 S.Ct. 1355, 12 L.Ed.2d 309.

agree that the district judge was "clearly wrong" in the limitations he placed upon the inquiry. I also disagree with the conclusion that the "trial court patently erred" in his conduct of this portion of the trial. Thus, as indicated, I concur only in the result reached by the majority.