**UNITED STATES of America, Appellee,**

v.

**Thomas Lionel IRON MOCCASIN, Appellant.**

No. 88–5318.

United States Court of Appeals, Eighth Circuit.

Submitted March 16, 1989.

Decided June 21, 1989.

Craig E. Smith, Gettysburg, S.D., for appellant.

Mikal Hanson, Pierre, S.D., for appellee.

Before LAY, Chief Judge, WOLLMAN, and MAGILL, Circuit Judges.

MAGILL, Circuit Judge.

Following a five-day jury trial,[1] appellant Thomas Lionel Iron Moccasin was convicted of three counts in violation of 18 U.S.C. §§ 1153 and 2242 (sexual abuse) and one count in violation of 18 U.S.C. §§ 1153 and 2244 (abusive sexual conduct).[2] The offenses occurred on the Cheyenne River Sioux Indian Reservation of Eagle Butte, South Dakota. The victim was Stacy Youngbird, Iron Moccasin's eighteen-year-old stepdaughter. On appeal, Iron Moccasin raises ten issues challenging the propriety of his trial. We find no reversible error and, consequently, we affirm.

I.

On April 4, 1987, Iron Moccasin's wife and sister-in-law traveled together to Rapid City, South Dakota. They left Iron Moccasin at home with their four children (Stacy Youngbird, 18; Fawn Little Sky, 10; and two small boys). Ms. Youngbird suffers from birth defects related to Down's Syndrome. Her academic skills are on a second grade level; her social skills have been rated somewhat lower.

The district court ruled that despite her handicap, Ms. Youngbird was competent to testify against Iron Moccasin. She stated that after her mother and aunt had left for Rapid City, Iron Moccasin approached her

---

**1.** The Honorable Donald J. Porter, Chief Judge, United States District Court for the District of South Dakota.

**2.** The court sentenced Iron Moccasin to three fifteen-year terms to run concurrently for the § 2242 offenses and one five-year term for the § 2244 offense to run consecutively.

in the kitchen and forced her to perform oral sex.

Ten-year-old Fawn Little Sky, Ms. Youngbird's cousin, testified that she witnessed this kitchen assault. When she noticed that the kitchen door, which normally was left wide open, was nearly shut, she looked into the kitchen and saw a reflection of Iron Moccasin and Ms. Youngbird on the refrigerator. Fawn Little Sky testified that "Stacy looked unhappy * * * so I kept on watching. * * * And then a few minutes later Stacy starts touching Lionel's private part." Tr. at 146–47. In the evening, Fawn Little Sky and Ms. Youngbird were alone together. When Ms. Youngbird began to explain what had happened in the kitchen, Fawn Little Sky told her that she had seen it.

All of the children were afraid of Iron Moccasin, so instead of sleeping in their own rooms that night, they slept together in the living room. Later, Iron Moccasin, angered to find one of the boys sleeping on the coffee table, woke the children and ordered Fawn Little Sky and the boys to their rooms. Then he forced Ms. Youngbird to have intercourse with him, first on the coffee table and later in Ms. Youngbird's room.

When Ms. Youngbird's mother and aunt returned from Rapid City, Fawn Little Sky told them about Iron Moccasin's assaults on Ms. Youngbird. Her mother then placed Ms. Youngbird in a group home shelter called Black Hills Workshop. Ms. Youngbird was counselled there by a therapist named Linda Holcomb. Ms. Holcomb, who specializes in treatment of handicapped children, testified that Ms. Youngbird told her the details of the assaults. In addition to relating those details before the jury, Ms. Holcomb testified concerning her professional observations of Ms. Youngbird. She described Ms. Youngbird's continuing fear of Iron Moccasin and her recollections of the pain she suffered during the assaults. Another official at Black Hills related an incident in which Ms. Youngbird awoke from a nightmare:

A. Yeah. I went into her room and I sat down on the bed and I was kind of rubbing her arms and trying to keep her up and she finally woke up and then she sat up and she just really hugged me and she was just in a cold sweat and then I asked what she was dreaming about and she said she had a bad dream about her step-father doing bad things to her.
Tr. at 133.

## II.

Iron Moccasin's first contention on appeal is that during the jury selection process, the prosecution violated his rights under the Equal Protection Clause of the fourteenth amendment. He claims that the prosecution used its last peremptory challenge discriminatorily by removing Milo LeBeau, the only American Indian[3] in the venire. The government counters that it removed LeBeau for race-neutral reasons.

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that the Equal Protection Clause bars prosecutors from challenging potential jurors "solely on account of their race." *Id.* at 89, 106 S.Ct. at 1719. The Court indicated that when evaluating allegedly discriminatory peremptory challenges, courts should initially presume that the jury selection was lawful. To overcome the presumption, the party alleging discrimination must establish:

(1) that he is a member of a *cognizable racial group;*

(2) that the *prosecution removed members* of the group by peremptory challenges; and

(3) that the *facts and other relevant circumstances* raise an inference that the prosecution used the peremptory challenges to exclude the removed veniremen because of their race.

If the defendant establishes these three elements, the government must then give a "clear and reasonably specific expla-

3. The government does not concede that the removed juror was the only American Indian in the venire, but for purposes of this discussion, we will assume that he was.

nation" of its race-neutral reasons for each peremptory challenge. *Id.* at 98 n. 20, 106 S.Ct. at 1723 n. 20 (quoting *Alexander v. Louisiana*, 405 U.S. 625, 632, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536 (1971)).[4]

■ Iron Moccasin is an American Indian. This is a cognizable racial group for purposes of a *Batson* analysis. *United States v. Chalan*, 812 F.2d 1302, 1314 (10th Cir.1987). It is not disputed that the prosecution used a peremptory challenge to remove an American Indian man from the venire. Since the peremptory challenge left Iron Moccasin with a petit jury devoid of American Indians, and since his sensitive and highly emotional trial involved offenses allegedly committed by an American Indian on an Indian reservation, we believe that the facts and circumstances surrounding the jury selection are sufficient to raise an inference that the peremptory challenge was racially motivated.

■ Now the burden shifts, and the government must respond to Iron Moccasin's *prima facie* case of discrimination with clear and reasonably specific explanations of its race-neutral motivations. The government asserts three such explanations:

(1) the potential juror knew Iron Moccasin;

(2) the potential juror is also a step-father;

(3) the potential juror lives, like Iron Moccasin, in Eagle Butte, South Dakota.

Although we take no position on the second and third explanations, we find no error in the district court's acceptance of the first. Even in the absence of racial issues, one might well expect a prosecutor routinely to use peremptory challenges to remove venirepersons acquainted with the defendant. Therefore, we conclude that the district court did not err in accepting the race-neutral explanation proffered by the prosecution and permitting the peremptory challenge of Milo LeBeau.

■ Iron Moccasin emphasizes that the court erred by failing to make a formal ruling on the *Batson* issue. However, as this court has recently explained, a district judge need not hold an evidentiary hearing or "mini-trial" on the merits of every *Batson* claim. *See United States v. Roan Eagle*, 867 F.2d 436 (8th Cir.1989). Instead of requiring such an "intrusion on the trial proceedings[,] * * * *Batson* requires the prosecutor to 'articulate a neutral explanation related to the particular case * * *.'" *Id.* at 441 (citing *United States v. Garrison*, 849 F.2d 103, 106 (4th Cir.1988) (citations omitted)).

The prosecutor did articulate a specific race-neutral explanation for the disputed peremptory challenge in this case (LeBeau's personal acquaintance with Iron Moccasin), and the court concluded that the challenge was not discriminatory. As the *Roan Eagle* court held,

[*Batson* analysis] need not necessarily be a lengthy process. If the trial judge is able to reach a determination on the basis of a short exchange between prosecutor and defense then that is the trial court's perogative [sic]. The scope of [appellate review of *Batson* issues] is restricted to a determination of whether the trial court was 'clearly erroneous' in its factual basis and had a reasonable basis for concluding that the prosecutor's explanation was racially neutral.

*Id.*

We find no error in the district court's handling of Iron Moccasin's *Batson* arguments. The procedure followed by the court was perfectly consistent with this court's *Roan Eagle* analysis: the prosecution was permitted to state its nondiscriminatory explanation for the peremptory challenge of LeBeau, the court believed it, and the trial continued without the delay or disruption.

### III.

■ Iron Moccasin also argues that the prosecution violated his rights under the sixth amendment Confrontation Clause by

---

**4.** For recent *Batson* analysis in this circuit, *see United States v. Battle*, 836 F.2d 1084 (8th Cir. 1988), and *United States v. Roan Eagle*, 867 F.2d 436 (8th Cir.1989).

placing a small easel between the defense table and the witness stand during Ms. Youngbird's testimony. He alleges that the easel, which displayed a diagram exhibit, blocked his view of Ms. Youngbird and vice versa. Iron Moccasin did not object to the placement of the easel during the trial.

In support of his position, Iron Moccasin relies on the recent Supreme Court opinion in *Coy v. Iowa*, — U.S. ——, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988). In *Coy*, the defendant was charged with sexually assaulting two thirteen-year-old girls. During his trial, the prosecution, pursuant to a recently-enacted Iowa statute, placed a large screen between the defendant and the girls. The screen was designed to protect the girls from seeing their alleged attacker. The defendant could see dim outlines of the girls through the screen; they could not see him at all. Lights in the courtroom were dimmed to enhance the screen's view-blocking effect.

The defendant objected strenuously to the use of the screen, insisting that the screen (1) violated his sixth amendment right to confront his accusers, and (2) denied him due process because the entire procedure diluted the presumption of innocence and intentionally "made him look guilty." *Id.* 108 S.Ct. at 2799. The trial court rejected the defendant's constitutional claims and the Iowa Supreme Court affirmed. *State v. Coy*, 397 N.W.2d 730 (1986).

The Supreme Court reversed and remanded the defendant's conviction, emphasizing that the constitutional guarantee that defendants are entitled "to be confronted with the witnesses against [them]" is to be interpreted literally. The Court includes quotations from the Roman Governor Festus, William Shakespeare, and President Eisenhower to underscore its conclusion that the sixth amendment guarantees true physical confrontation between defendants and their accusers, not just the right to cross-examine hostile witnesses:

> We have never doubted, therefore, that the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact * * *. [W]e have described the "literal right to 'confront' the witness at the time of trial" as forming "the core of the values furthered by the Confrontation Clause." *California v. Green*, [399 U.S. 149, 157, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489 (1970)].

*Id.* 108 S.Ct. at 2800–01.

We conclude that *Coy* is distinguishable from the instant case. The *Coy* Court emphasized that "the screen at issue was specifically designed to enable the complaining witnesses to avoid viewing appellant as they gave their testimony, and the record indicates that it was successful in this objective." *Id.* 108 S.Ct. at 2802. The same cannot be said of the small diagram easel used by the prosecution in the instant case. We see no evidence indicating that the easel was intentionally placed between defense table and the witness stand to prevent face-to-face confrontation. The record indicates that it was put in place to display diagrams, not to protect Ms. Youngbird's sensibilities. The intentional shielding in *Coy* was reinforced by the dimming of the courtroom lights; no such steps were taken in the instant case.

Perhaps most importantly, this scenario differs from *Coy* in that Iron Moccasin did not object at any time during his trial to the placement of the easel. He voices his objections for the first time in this appeal. Since there was no objection at trial, any conclusion on our part as to whether the easel did in fact block the line of vision between Iron Moccasin and Ms. Youngbird would be speculative. Although we acknowledge *Coy's* unequivocal holding that the sixth amendment Confrontation Clause must be read literally in cases in which barriers are intentionally placed between the defendant and his accusers, we find no such intentional view-blocking in this case, so there is no plain error.[5]

For the reasons stated herein, we affirm.

---

5. Iron Moccasin also argues that his conviction should be reversed because:

(1) the district court refused to allow him to introduce character evidence concerning his sexual morality;

(2) the district court refused to allow him to introduce testimony about another alleged sexual assault on Ms. Youngbird;

(3) the prosecution used a leading question to establish an essential element of the crimes with which Iron Moccasin was charged;

(4) the district court denied his motion for judgment of acquittal;

(5) the district court permitted the submission of four improper jury instructions;

(6) the district court permitted the admission of improper expert testimony under Rule 803(4) of the Federal Rules of Evidence;

(7) the district court ruled erroneously that Ms. Youngbird was competent to testify;

(8) the district court refused to admit two of the exhibits he offered concerning Ms. Youngbird's alleged propensity to lie.

We have examined these eight claims thoroughly and find them meritless. We therefore dismiss them on the merits.