**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

No. 97-1918

United States of America,  *
                            *
        Appellee,      *
                            * Appeal from the United
States
        v.             * District Court for the
                            * District of South Dakota.
Kermit Miner,         *
                            *
        Appellant.     *

Submitted:  November 21, 1997

Filed:  December 23, 1997

Before LOKEN, HEANEY, and BRIGHT, Circuit Judges.

HEANEY, Circuit Judge.

Kermit Miner appeals his conviction of abusive sexual contact with a minor, alleging that the evidence produced at trial was insufficient and that the victim recanted her testimony.  We affirm.

On May 8, 1996, Kermit Miner was indicted on two counts of abusive sexual contact and one count of sexual abuse of a minor. The indictment alleged that on two separate occasions, Miner sexually abused his stepdaughter S.J. The first alleged incident occurred on November 8, 1995, and gave rise to Counts I and II, abusive sexual contact and sexual abuse of a minor, respectively. The second alleged incident occurred on December 7, 1995, and gave rise to Count III, abusive sexual contact. Miner's trial commenced on October 28, 1996, after which a jury acquitted him of Counts I and II and convicted him of Count III. On March 21, 1997, Miner was sentenced to twenty-four months of incarceration, a special assessment, and supervised release. On March 31, 1997, Miner filed notice of appeal to this court.

At the time of trial, Kermit Miner was thirty-two years old and had a sixth-grade education. He lived with his wife, Audrey Miner, and their eleven natural and foster children in White Horse on the Cheyenne River Indian Reservation in South Dakota. Additionally, as many as five other adults lived on the premises. The Miner household included two houses, the main house and a small, two-room auxiliary house (log house) located behind the main house. At most, the two-level main house measured 36 feet by 15 feet giving it a total of 1,080 square feet. Similarly, the log house measured 23 feet by 15 feet giving it a total of 345 square feet. In total, as many as eighteen residents shared 1,425 square feet of living space.

On December 11, 1995, Diane Chasing Hawk, one of the adults living in the Miner household, went to Standing Rock Sioux Tribal Social Services Department and reported her suspicions that Kermit Miner was abusing the children in his home.  In response to this report, Aldina Moran, a child protection worker for the state of South Dakota, went to the Timber Lake School on December 21, 1995, and interviewed several of the children from the Miner household.  Kermit Miner's stepdaughter, S.J., who was fourteen at the time, told Ms. Moran that her stepfather had sexually abused

her on two occasions. S.J. was subsequently removed from the household and her mother, Audrey Miner, was allowed supervised visits.

At trial, S.J. testified that both instances of sexual abuse occurred when Audrey Miner was absent. S.J. testified that the first incident happened on November 8, 1995, following a trip to Timber Lake where Kermit Miner played volleyball. After returning home late that night, Kermit Miner made her take a VCR and TV to the log house. In the bedroom of the log house, Kermit Miner pulled down S.J.'s pants; started touching her, her breasts and vaginal area; and tried to kiss her vagina. She testified that during this time she was crying and she tried to push him away. She testified that he gave her five dollars.

S.J. stated that the second incident occurred on December 7, 1995, when illness kept her from school. On this occasion, again in the log house, Kermit Miner pushed her shirt and bra up around her neck, rubbed her breasts, and told S.J. that her breasts were soft. S.J. told him to stop touching her and that it was her body, but Miner continued until S.J.'s cousin and two younger brothers came back from school. E.F.H., S.J.'s nine-year-old cousin, testified that he saw Kermit Miner and S.J. lying on a bed, Miner was touching S.J.'s side, and Miner was "doing nasty" to S.J. (Tr. at 145.)

On appeal, Kermit Miner challenges the sufficiency of the evidence supporting his conviction on two bases. First, Miner points out that S.J. twice recanted her testimony and alleges that S.J. fabricated her

4

allegations of sexual abuse.  Second, Miner contends that the jury reached a compromise verdict in that there are no real factual differences between the conduct for which he was acquitted and that for which he was convicted. Because  substantial evidence supports his conviction, we affirm.

## II.

In reviewing the sufficiency of the evidence for a criminal conviction, we view the evidence in the light most favorable to the government and accept as established all reasonable inferences supporting the verdict. United States v. Black Cloud, 101 F.3d 1258, 1263 (8th Cir. 1996); see also Glasser v. United States, 315 U.S. 60, 80 (1942). "The evidence need not exclude every reasonable hypothesis of innocence, but simply be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty." United States v. McGuire, 45 F.3d 1177, 1186 (8th Cir. 1995) (citation omitted). Furthermore, because circumstantial evidence is as inherently probative as direct evidence, Holland v. United States, 348 U.S. 121, 140 (1954), the same standard applies to verdicts based entirely, or in part, on circumstantial evidence. United States v. Carlson, 547 F.2d 1346, 1360 (8th Cir. 1976).

At trial, the jury had ample evidence from which it could have concluded Miner's guilt. S.J. provided extensive and detailed evidence of Kermit Miner's sexual abuse. Diane Chasing Hawk, rather than S.J., initially raised the specter of sexual abuse. Consequently, S.J. had no warning that Aldina Moran would investigate activities in the Miner household. Ms. Moran conducted an extensive interview at which S.J. provided a detailed description of two incidents of sexual abuse, including dates, times, and places. During the interview, S.J. was emotional and cried. Finally, details surrounding the second incident were corroborated by E.F.H., S.J.'s nine-year-old cousin.

6

Despite S.J.'s recantations which make this a closer case, we conclude that substantial evidence supports Miner's conviction. S.J.'s first recantation occurred on June 29, 1996 in a private meeting between S.J. and Kermit Miner's attorney. At the meeting S.J. signed a note written by the attorney disavowing her allegations of sexual abuse which was later admitted as Exhibit 7 at trial. Three weeks after signing the note, S.J. reaffirmed her recantation. At trial, however, S.J. changed her position and

renewed her allegations that Kermit Miner sexually abused her. The jury was aware of the fact that S.J. initially reported sexual abuse; that she recanted these charges; that S.J. reaffirmed her recantation; and that she testified at trial consistent with her original allegations. Having weighed S.J.'s credibility in light of her changed position as well as the other evidence produced at trial, the jury convicted Kermit Miner. Viewing the evidence in the light most favorable to the government and accepting all reasonable inferences supporting the verdict, we find nothing in the first recantation that warrants reversal.

Because we affirm Miner's conviction in light of S.J.'s first recantation, the second recantation will warrant reversal only if it raises a strong enough inference of innocence to warrant a new trial on the ground of newly discovered evidence under Rule 33 of the Federal Rules of Criminal Procedure. Courts look upon recantations with suspicion. United States v. Provost, 969 F.2d 617, 619-20 (8th Cir. 1992) (citation omitted). "[S]kepticism about recantations is especially applicable in cases of child sexual abuse where recantation is a recurring phenomenon" such as "when family members are involved and the child has feelings of guilt or the family members seek to influence the child to change her story." Id. at 621 (citations omitted). At trial, expert testimony revealed that recantations are very common in child sexual abuse.

The second recantation occurred on April 10, 1997. S.J. signed an affidavit to the effect that her allegations of sexual abuse were untrue and that she made

8

them up because she hated Kermit Miner.  The affidavit alleged that Diane Chasing Hawk offered S.J. money to fabricate charges of sexual abuse and that social services and the Assistant U.S. Attorney Mikal Hanson manipulated S.J. into providing false testimony.

A careful review of the record suggests that Audrey Miner pressured S.J. before trial, and this pressure may have had an effect on S.J.'s recantations.  For example, in her first supervised visit with S.J., Audrey expressed disbelief in S.J.'s description of the alleged sexual abuse.  In another supervised visit on January 19, 1996, Audrey told

a social worker that she did not believe S.J.  During this meeting, S.J. became very upset and cried.  At trial, Deanne Ducheneaux, the Assistant Coordinator for Sacred Heart Adolescent Program where S.J. was eventually placed, testified that Audrey frequently put pressure on S.J. before trial.  The week before trial, Audrey called S.J. at Sacred Heart Adolescent Center and told S.J. that she had a heart attack and was minutes away from dying. Audrey told S.J. that her allegations of sexual abuse and the upcoming trial had put a lot of stress upon Audrey. During the same phone call, S.J.'s little sister got on the phone and said "don't say nothing bad about my daddy."  (Tr. at 394.)  Finally, on June 28, 1996, apparently in violation of a tribal court order, Audrey Miner took S.J. from her social services placement with relatives in Little Eagle, South Dakota, back to White Horse, South Dakota.  The next day, Audrey Miner took S.J. to Fort Pierre to meet with Kermit Miner's attorney at which point S.J. signed her first recantation.  Under these circumstances, we conclude that S.J.'s second recantation does not raise a sufficiently strong inference of innocence to warrant reversal.

Miner also contends that the jury reached a compromise verdict in that there are no real factual differences between the alleged November 8, 1995 incident which gave rise to Counts I and II, on which he was acquitted, and the alleged December 8, 1995 incident giving rise to Count III, on which he was convicted. Miner argues that the jury did not believe that he was guilty of Counts I and II and, because there was less evidence to support Count III, his conviction should not stand.  We disagree.  Counts I and II were not supported

10

by eyewitness testimony at trial, whereas Count III was supported by E.F.H.'s eyewitness testimony.

Incidentally, as we noted above, as many as eighteen people inhabited the Miner household, including eleven natural and foster children of Audrey and Kermit Miner. This court cannot understand why the Department of the Interior, the Tribe, and other agencies permitted foster children to be placed in this already over-crowded home.

Over the last ten years at least forty convictions for the sexual abuse of children or young adults, involving Native Americans, in the United States District Court for the District of South Dakota have been appealed to this court.[1]  Of that number, at least

---

[1]See United States v. Wright, 119 F.3d 630 (8th Cir. 1997) (affirmed) (familial); United States v. Cournoyer, 118 F.3d 1279 (8th Cir. 1997) (affirmed) (non-familial); United States v. Rouse, 111 F.3d 561 (8th Cir. 1997) (affirmed) (familial); United States v. Goodlow, 105 F.3d 1203 (8th Cir. 1997) (affirmed) (familial); United States v. LeCompte, 99 F.3d 274 (8th Cir. 1996) (reversed and remanded) (familial); United States v. Hale, No. 95-3113, 1996 WL 39628 (8th Cir. Feb. 2, 1996) (per curiam) (affirmed) (facts unclear whether familial); United States v. NB, 59 F.3d 771 (8th Cir. 1995) (affirmed) (familial); United States v. Ponca, No. 94-3981, 1995 WL 299168 (8th Cir. May 18, 1995) (per curiam) (affirmed) (familial); United States v. Young, No. 94-2077, 1994 WL 577466 (8th Cir. Oct. 21 1994) (per curiam) (affirmed) (familial); United States v. Farmer, 32 F.3d 369 (8th Cir. 1994) (affirmed) (non-familial); United States v. Saknikent, 30 F.3d 1012 (8th Cir. 1994) (affirmed) (non-familial); United States v. Whitted, 11 F.3d 782 (8th Cir. 1993) (reversed and remanded) (familial); United States v. Has No Horse, 11 F.3d 104 (8th Cir. 1993) (reversed and remanded) (non-familial); United States v. Knife, 9 F.3d 705 (8th Cir. 1993) (affirmed) (familial); United States v. Martinez, 3 F.3d 1191 (8th Cir. 1993) (affirmed) (non-familial); United States v. Shoulders, No. 92-3591, 1993 WL 326364 (8th Cir. Aug. 27 1993) (per curiam) (affirmed) (familial); United States v. Bear Stops, 997 F.2d 451 (8th Cir. 1993) (affirmed in part, reversed in part and remanded) (familial); United States v. Eagleman, No. 92-2882, 1993 WL 41382 (8th Cir. Feb. 22, 1993) (per curiam) (affirmed) (familial); United States v. Drapeau, 978 F.2d 1072 (8th Cir. 1992) (affirmed) (facts unclear whether familial); United States v. Claymore, 978 F.2d 421 (8th Cir. 1992) (affirmed) (non-familial); United States v. Bad Yellow Hair, No. 91-3704, 1992 WL 184103 (8th Cir. Aug. 5, 1992) (per curiam) (affirmed) (facts unclear whether familial); United States v. Crane, 965 F.2d 586 (8th Cir. 1992) (affirmed) (familial); United States v. Balfany, 965 F.2d 575 (8th Cir. 1992) (familial); United States v. Fawbush, 946 F.2d 584 (8th Cir. 1991) (conviction affirmed, but case remanded for resentencing) (non-familial); United States v. Plenty Arrows, 946 F.2d 62 (8th Cir. 1991) (reversed and remanded) (familial); United States v. Drapeau, 943 F.2d 27 (8th Cir. 1991) (affirmed) (non-familial, different case than one with same case name

twenty-five represented instances in which children or young adults were abused by a father or another family member.  Of those, we reversed the convictions in seven cases.  Unfortunately, in examining these cases, the number of appeals in the most recent five years or so has risen approximately fifteen percent, indicating that little or no progress has been made by the United States Department of Interior, the Tribe, or any of the federal or state agencies that are involved in reducing the incidents of sexual abuse on poverty-stricken Indian reservations.  This fact certainly suggests that all interested agencies should consider alternative programs that will reduce the prevalence of this crime on South Dakota Indian reservations.

III.

---

above); United States v. Two Bulls, 940 F.2d 380 (8th Cir. 1991) (per curiam) (affirmed) (non-familial); Arcoren v. United States, 929 F.2d 1235 (8th Cir. 1991) (affirmed) (familial); United States v. Clown, 925 F.2d 270 (8th Cir. 1991) (conviction affirmed, but case remanded for resentencing) (familial); United States v. Two Bulls, 918 F.2d 56 (8th Cir. 1990) (vacated and remanded) (facts unclear whether familial; different case than one with same case name above); United States v. Eagle Thunder, 893 F.2d 950 (8th Cir. 1990) (affirmed) (non-familial); United v. Duran, 886 F.2d 167 (8th Cir. 1989) (affirmed) (familial); United States v. Spotted War Bonnet, 882 F.2d 1360 (8th Cir. 1989), vacated and remanded, 497 U.S. 1021 (1990) (Mem.), 933 F.2d 1471, aff'g, (8th Cir. 1991) (familial); United States v. Iron Moccasin, 878 F.2d 226 (8th Cir. 1989) (affirmed) (familial); United States v. Demarrias, 876 F.2d 674 (8th Cir. 1989) (affirmed) (familial); United States v. Provost, 875 F.2d 172 (8th Cir. 1989) (affirmed) (familial); United States v. Red Feather, 865 F.2d 169 (8th Cir. 1989) (per curiam) (affirmed) (familial); United States v. St. John, 851 F.2d 1096 (8th Cir. 1988) (affirmed) (familial); United States v. St. Pierre, 812 F.2d 417 (8th Cir. 1987) (affirmed) (familial).

Because substantial evidence supports Kermit Miner's conviction, we affirm.

BRIGHT, Circuit Judge, concurring separately.

I commend my distinguished colleague, Judge Heaney, for his pertinent remarks calling attention to what I believe may be the root cause of child abuse crimes on the South Dakota Indian Reservation; that is, the degraded living conditions of families on the Indian reservations. The government has or will spend well over $50,000 in the criminal prosecution and incarceration of Kermit Miner. Although he will be removed from the family for about two years, I question whether the family situation will be bettered by his absence or improved on his return from prison.

Child abuse on the reservation or anywhere is a serious matter. I suggest in particular on the reservation, improvement in housing conditions and intensive education of parents and children about the problem might reduce the incidence of the sort of abuse that occurred here. All federal agencies interested in the welfare of Native Americans in South Dakota need to focus on rehabilitation, better housing and education opportunities to alleviate the problem of child abuse on the reservation.

The interest and action of federal prosecutors in this regard could well serve as a catalyst for improvement of living conditions at the Cheyenne River Indian Reservation and other Indian reservations in South Dakota and, thereby, reduce the incidence of child abuse.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.