**IT IS HEREBY ORDERED** that the parties' joint motion for claim construction by the Court [Doc. # 74] is granted as follows.

**IT IS FURTHER ORDERED** that the fourth element of claim 7 of U.S. Patent No. 5,383,829 is not limited to guides which are inclined relative to the floor or to inclined paths of travel.

**UNITED STATES of America,**
**Plaintiff,**

v.

**Royce Gregory LOUDNER, Defendant.**

**No. CR 92–30016, CIV 00–3014.**

United States District Court,
D. South Dakota,
Central Division.

April 29, 2002.

Mikal G. Hanson, Assistant United States Attorney, Pierre, SD, for Plaintiff.

Patricia A. Leary Carlson, Pierre, SD, for Defendant.

## ORDER

KORNMANN, District Judge.

This is a proceeding brought pursuant to 28 U.S.C. § 2255 by Royce Loudner ("petitioner"). The matter was referred to

United States Magistrate Judge Mark Moreno pursuant to 28 U.S.C. § 636(b)(1)(B). Magistrate Moreno proceeded in all things as directed by the district court and issued a report and recommendations (Doc. 129) containing his findings and conclusions after having conducted an evidentiary hearing. We know, of course, that an evidentiary hearing need not be held in these cases. See Rule 8 of the Rules Governing Section 2255 Proceedings. The standard is similar to that of dealing with a motion for a new trial pursuant to Fed.R.Crim.P. § 33. In fact, only "exceptional circumstances" require an evidentiary hearing in connection with a motion for a new trial. *United States v. Ward,* 544 F.2d 975, 976 (8th Cir.1976). Having not taken office until May of 1995, I have no familiarity with the evidence received at trial or the demeanor and credibility of witnesses at the trial. Likewise, the magistrate had no such familiarity with the evidence or the witnesses. A recantation of testimony, in and of itself, does not require the court to conduct an evidentiary hearing in connection with a motion for a new trial. *United States v. Provost,* 969 F.2d 617, 619 (8th Cir.1992). All factors present here present a case where exceptional circumstances required a hearing and the magistrate acted correctly in conducting such a hearing.

Petitioner filed objections (Doc. 131) to the report and recommendations.

The magistrate recommended that the motion or petition under 28 U.S.C. § 2255 was timely filed. No objection has been filed by the government to this recommendation. That recommendation is accepted and adopted without objection.

I have reviewed the transcript of the sentencing hearing (27 pages). I have also reviewed the trial transcript. It consists of three volumes and is very lengthy (560 pages). The extent of the record is very frankly out of all proportion to what would be expected in a trial of this type. The trial judge, bless his soul, was obviously experiencing the initial onset of significant health problems which in later years became fully manifest. He struggled mightily with the legal issues, especially questions of evidence. Numerous bench conferences and numerous conferences in chambers were required. Possible rulings, probable rulings, offers of proof, and final rulings make it more complicated to follow what happened at the trial. I am convinced, however, that, in the final analysis, the petitioner received a fair trial.

I will first discuss some of the evidence. References to the trial transcript will be T followed by the page number. References to the transcript (Doc. 126) of the evidentiary hearing (which I have also read) conducted by the magistrate will be TR followed by the page number. Rev. Harold Blew was finally permitted to tell the jury that the victim had told him in late March or early April of 1992 (shortly after the alleged acts of sexual assault alleged in Counts 1 and 2 of the indictment to have occurred on January 27, 1992) that she had been assaulted in the weeds toward the Red Horse Lodge and that "somebody that she didn't know had assaulted her" sexually (T 519). Petitioner's trial attorney should not have been permitted to question Rev. Blew about these statements since the victim had not first been asked whether she had made any such statements. In other words, it was hearsay since there was nothing to impeach. Petitioner thus received more than that to which he was entitled under the Federal Rules of Evidence. The victim testified before the magistrate in the present matter that she made no such statements to Rev. Blew (TR 20).

Petitioner's ex-paramour Lynette Walking Eagle was also permitted to tell the

jury that the victim, during the end of March of 1992, told her that petitioner had not assaulted her. "Lynette, it wasn't Royce, it was someone else." (T 343) The victim was asked whether she had made any such statement to Lynette; she denied it (T 92). She denied it again before the magistrate (TR 20).

Charity, an older sister of the victim, testified in connection with an offer of proof at the trial, indicating that two days after January 29, 1992, the victim told her that she had been attacked by some drunk who grabbed her, threw her down, and got on top of her. According to Charity, the victim also related that she had bitten the man and she escaped. The victim denied at trial having told Charity anything about this particular assault (T 91). The trial judge rejected this offer of proof and did not permit Charity to testify as to these matters, the rationale being that the testimony would not really have impeached the testimony of the victim other than as to collateral matters. Charity did not testify in the offer of proof (other than perhaps in response to a leading question) that the victim had stated that she did not know the person who had assaulted her. To further confuse matters, the victim testified at the evidentiary hearing before Magistrate Moreno that she had told Charity at the time of the trial that petitioner had not raped her (TR 20). Charity testified at the evidentiary hearing that the victim had told her she did not know who had sexually assaulted her and she was told this at the time of trial (TR 73, 74). Yet nothing was presented by way of an offer of proof at trial from Charity as to either of these versions. It is clear that, during the offer of proof, Charity was simply asked to answer the question as to what the victim had told her (T 321) and she answered the question. It is not true, as Charity testified before the magistrate (TR 74), that no one asked her "the question."

Lynette, Rev. Blew and others testified at trial that the victim had a reputation for being untruthful. Testimony was presented at trial that the victim showed no animosity toward petitioner after the alleged sexual assaults. Petitioner and others testified at trial at length as to an alibi that petitioner claimed to have.

Petitioner's family and friends feel strongly that he is innocent and should not have been convicted. The fact remains: only two people know directly and personally what happened, namely the victim and petitioner. This is a common fact in sexual assault cases, namely "she said, he said." The problem here, of course, is that she has said and written many things which are absolutely contradictory. The report and recommendations details this. We start with the letter written by the victim to her aunt in which she names petitioner. She identified to Dr. Jones, a very experienced medical expert who found evidence of rape trauma which had occurred a matter of days before he saw her, that petitioner had done it. She no longer recalls having talked with Dr. Jones (TR 41). She identified the petitioner as the perpetrator to Margaret Pier, an experienced mental health professional who interviewed the victim twice. She told AUSA Hanson during his first meeting with her that petitioner was the perpetrator and she told the same thing to two FBI agents who interviewed her. She identified petitioner as the perpetrator during the jury trial. She was crying during her testimony. The very detailed accounts of the assaults as given to health care providers and law enforcement officials were always consistent. She was eleven years old at the time of trial. She told her counselors and others in the various institutions that petitioner was the perpetrator.

She then, however, on January 17, 1997, recanted. About one hour later, she with-

drew the recantation. The report and recommendation details the placements of the victim and her conflicting statements since January 17, 1997. She signed an affidavit of recantation without reading it (TR 43, 44). She had just gotten out of bed when petitioner's attorney came to see her. On October 11, 2002, the victim told two FBI agents that her testimony at trial had been truthful but testified at the evidentiary hearing that she lied to them (TR 46). The prosecutor noted on the record that her "eyes are down", "not looking up", and claimed her body language was to the effect that she was not testifying truthfully (TR 46). Before the hearing she told the prosecutor that she "didn't want to be there (in court) and if she had to go, she didn't know whether she could tell the truth" (TR 50). Three or four days before the hearing she again told the prosecutor and the victim witness advocate that her trial testimony had been true; she made this statement when she was not threatened or afraid of the prosecutor who told her to simply tell the truth (TR 51). She had no explanation why she claimed at the hearing to have lied three or four days previously. She testified the petitioner is innocent of the crimes. The prosecutor stated on the record that she took about four to five seconds to answer, that her head was down and her eyes were downcast; the magistrate agreed with these observations and stated he would take what he saw into account in making his credibility determination (TR 63).

The magistrate questioned the victim at length. When asked why she testified otherwise at trial, her response was "I don't know" (TR 66). When asked why she had later falsely accused Raynard Bad Moccasin of having been the perpetrator, she again stated she did not know. In short, she had no explanation for telling a claimed lie at trial and then later telling lies about who "did these things" (TR 66). She admitted telling lies about what happened "lots of times"; when asked "why", she said "I'm not going to say" (TR 67). The next question was "then why the lies?" and the answer again was "I don't know" (TR 67). The victim was crying when she said the petitioner had not sexually assaulted her, did not know why she was crying, and stated she did not "want to be here" (TR 70). She felt "threatened" by the large number of people in the courtroom, all members of petitioner's family.

A social worker who knew the victim well testified. The victim was described as "overly concerned with her mother, always has been, would do whatever she had to do to get to her mother, to talk to her mother. If it meant escaping and stealing a car to go see her mother, she did that over and over again" (TR 120). We know that, at the time of the hearing, the victim was serving time for grand theft, auto. She was concerned with her mother's health, safety, and drinking; she was concerned that her mother would die (TR 120). Yet, in all the years the victim was in various institutions, including the women's state penitentiary in Pierre, the city of the mother's residence, the mother never went to see the victim. The social worker described the victim as a little "obsessed" with concerns for her mother (TR 133). All this evidence clearly provides a plausible motive for the victim to recant to "save" her mother and to put her finally, after so many years, in good graces with her mother. The mother had never supported the victim at trial or as to her accusations. The victim explained as well that the former paramour of petitioner had threatened her as well as the mother and had told others to "beat her up" for what she had testified to at trial (TR 45) and to "kick her ass" (TR 57, 58). Whether the mother actually had been threatened and was at risk is not the question. The question is: what did the victim believe?

There is no question about that. Her beliefs were strong and consistent.

The standards are clear in the Eighth Circuit. Motions for a new trial on newly discovered evidence are disfavored. *United States v. Jones,* 34 F.3d 596, 600 (8th Cir.1994), *cert. denied,* 514 U.S. 1067, 115 S.Ct. 1701, 131 L.Ed.2d 563 (1995). This is not, as such, a motion for a new trial but the standard is to be applied as well in a case of this type where the result could be a new trial. "In general, a new trial will be granted only if the evidence was not discovered until after the trial; there was no lack of diligence by the movant; and the new evidence is material, more than merely cumulative or impeaching, and likely to produce an acquittal if a new trial is granted. *See United States v. L'Donna,* 179 F.3d 626, 629 (8th Cir.1999)." *United States v. Dogskin,* 265 F.3d 682, 685 (8th Cir.2001). "Like most courts, we 'look upon recantation with suspicion.' *United States v. Provost,* 969 F.2d 617, 619 (8th Cir.1992), *cert. denied,* 506 U.S. 1056, 113 S.Ct. 986, 122 L.Ed.2d 139 (1993); *see United States v. Papajohn,* 212 F.3d 1112, 1117 (8th Cir.2000); *United States v. Chambers,* 944 F.2d 1253, 1264 (6th Cir. 1991). However, recanted testimony that bears on a victim's credibility or directly on the defendant's guilt will warrant a new trial if it would probably produce an acquittal on retrial. *Lewis v. Erickson,* 946 F.2d 1361, 1362 (8th Cir.1991)." *United States v. Dogskin,* 265 F.3d at 685.

The evidence was not discovered until after trial. Petitioner exercised due diligence. The evidence is certainly material. It is more than impeachment since the testimony came from the victim herself. It is not merely cumulative. The petitioner's case fails, however, on the final test. Neither the magistrate nor I are convinced that the testimony "would probably produce an acquittal on retrial." It might but it certainly is not probable. The jury

heard, as already detailed, a great deal about the credibility of the victim, her poor reputation for truthfulness, and her claimed recantations to two people, one of whom was a clergyman. They rejected all that evidence and convicted the defendant of all three counts. Another jury, given all that has happened here, might very well do the same thing. The magistrate saw the victim on the stand and found her to be not credible as to the recantation. I have not seen her but the record clearly reflects her many vacillations and her body language running contrary to her testimony. She made the accusations when she was a very young girl. She attempts to recant when she is much older and a young lady. That is entitled to some significance. It is human nature that an older person finds it easier to concoct a story than does a young child and is driven by different motives which are more complex.

Any recantation presents serious concerns to the judge called upon to decide. One hopes and prays in each of these cases that an innocent person has not been sent to prison for a very long time.

The report and recommendations and its findings and conclusions should be adopted with the correction of one typographical error. On page 15, the last sentence in the last full paragraph should read as follows: "It was not until January 13, 1997, almost two years after beginning treatment that R.A. recanted her trial testimony and averred that Loudner was *not* the one who had sexual contact with her." (emphasis supplied) The motion should be denied.

Now, therefore,

IT IS ORDERED, as follows:

1) The report and recommendations (Doc. 129) together with the findings and conclusions contained therein are hereby

adopted, supplemented only by the foregoing Order.

2) The motion of the petitioner (Doc. 98) to set aside or correct sentence by a person in federal custody is denied.

3) The objections of the petitioner (Doc. 131) to the report and recommendations are overruled.

## REPORT AND RECOMMENDATIONS FOR DISPOSITION OF MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE

MORENO, United States Magistrate Judge.

### I.

[¶ 1] The above-captioned 28 U.S.C. § 2255 matter was referred to this Court by the District Court[1] pursuant to 28 U.S.C. § 636(b)(1)(B); for purposes of determining his *in forma pauperis* eligibility, conducting hearings, and submitting proposed findings of fact and recommendations for disposition of the matter.

[¶ 2] After careful review and consideration of all of the evidence and testimony presented as well as the records on file herein and being fully advised in the premises, the Court does now make and propose the following findings of fact, report and recommendations for disposition.

### II.

[¶ 3] Defendant, Royce Gregory Loudner (Loudner), an Indian, was originally indicted in March, 1992 on one count of aggravated sexual abuse, 18 U.S.C. § 2241(c) and 2245, one count of abusive sexual contact, 18 U.S.C. §§ 2244(a)(1) and 2245(3). On May 20, 1992, a superseding indictment was filed charging Loudner with an additional aggravated sexual abuse offense. Counts I and II alleged that Loudner sexually abused R.A., a 10–year–old girl, on or

about January 27, 1992 at Fort Thompson on the Crow Creek Indian Reservation in South Dakota. Loudner was charged in Count III with the sexual assault of R.A. between the time period of November 1, 1991 and January 30, 1992 at Fort Thompson. On July 18, 1992, a jury found Loudner guilty of all three counts. The trial court thereafter sentenced Loudner to 240 months of imprisonment.

[¶ 4] Subsequently, Loudner appealed his convictions. The Eighth Circuit Court of Appeals affirmed the trial court's judgment in an unpublished opinion filed on April 21, 1993.

[¶ 5] Almost seven years later, Loudner filed a motion under § 2255 to vacate, set aside or correct his sentence. Following the District Court's referral order, this Court heard testimony from six witnesses, including R.A., and received various documents into evidence. At the conclusion of the hearing, the Court took the matter under advisement.

### III.

[¶ 6] On January 30, 1992, R.A.'s mother, Barb Ashley, n/k/a Barb Ross, delivered an envelope, with a note in it, to Ashley/Ross's sister, Anita Koster. The note, written by R.A. to Koster, read as follows:

Dear Auntie Nita

So Hi, how are you doing? I wrote to say "Hi" so Hi antie[.] I have to tell you I miss you and just tell you something and I am crying because I got touched by [Loudner] and he said if I tell anybody he said heal do something to me[.][A]nd every time I go to sleep I keep thinking about that and it scares me[.][A]nd I get so scared that I get an knife and I try to kill my self and it scares me so bad I want to kill my self. [T]hat's the first time I have ever been

---

1. The Honorable Charles B. Kornmann, United States District Judge, presiding.

touched before and it scarey, auntie[.] I want to move back with you. [P]lease[.] I'm scared[.] I'm just scared[.][P]lease please I don't like being touched before[.][I]ts scary[.][P]lease come after me[.][I] don't like it[.] I feel like I got raped before and its herts[.] I'm crying[.][P]eople at school even say stuff to me[.][C]harity [R.A.'s sister] calls me a bitch at school and I got beet up at school from Crystal[.][P]eople just seem like they don't like me[.] I just feel like killing myself because I been called a bitch, ass hole, fuckin' hore, shit faise, blac bitch[.] I hate that[,] I just hate it[.] I'm a big-assed bitch, that's what everybody thinks at school[.] Nobody plays with me. Amber plays with me[.] Well, I have to go[.][R]emember what I said[.]

P.S. I love you and don't' forget it.

love Raylene<br>I love you always<br>aunti nita

[¶ 7] After reading the note, the South Dakota Department of Social Services was contacted and arrangements were made for R.A. to be seen by Dr. John Jones, a family practice physician. The next day, January 31, 1992, Dr. Jones met with, talked to and examined R.A. at Mid–Dakota Hospital in Chamberlain. Just before the examination, R.A. told Dr. Jones that on January 27, 1992, Loudner had knocked her down, unsnapped her pants, pulled them down, and she felt something wet that caused her a great deal of pain. With the help of a coldoscope, Dr. Jones found recent tears in R.A.'s hymen that were consistent with penile/vaginal contact.

[¶ 8] At trial, R.A. testified that while at Annette Walking Eagle's [2] house, Loudner touched her vaginal area with his penis.

R.A. marked on two diagrams and drew a picture for the jury of the sex act that occurred.

[¶ 9] R.A. also testified that Loudner touched her in a similar manner on a second occasion at the tribal hall near her Fort Thompson home. She reiterated that what Loudner did to her "felt wet" but maintained that during the second incident he threatened to use a knife on her if she told on him.

[¶ 10]Prior to trial, R.A. met with and talked to Margaret Pier, a psychologist and mental health therapist, in February and March, 1992. In her first session with Pier, R.A. described the events that took place at Walking Eagle's residence. Specifically, she related the painful ordeal of Loudner putting his penis in her "a little bit" resulting in "stuff" coming out that made her feel "wet". She further reported that Loudner admonished her not to "tell" or he would "get" her "with a knife". According to R.A., the incident was cut short when Grandma Melda, Walking Eagle's grandmother, came home unexpectedly.

[¶ 11]In her second session with Pier, R.A. discussed her encounter with Loudner at the tribal hall and detailed how Loudner had vaginally raped and threatened her with a knife.

[¶ 12]Loudner testified at trial and proclaimed his innocence. He relied on an alibi defense (which he attempted to substantiate by his own testimony and that of others), and asserted that he had never been alone with R.A., much less had sexual contact with her.

[¶ 13]From 1995 to February, 2000, R.A. was placed at McKennan Hospital in Sioux Falls, the Human Services Center in

---

**2.** For five years, Walking Eagle was the live-in girlfriend of Loudner and had three children with him. Coincidentally, Walking Eagle claimed that she and Loudner broke up on

January 27, 1992 (the date the offenses in Counts I and II took place) because she "found somebody else".

Yankton, Abbott House in Mitchell, the State Training School in Plankinton and the Turtle Creek Program in Redfield and remained under the supervision of the state court system and its court services department. On or about January 13, 1997, while at the Training School, R.A., for the first time, recanted her trial testimony, telling Rhonda Williams and Raylene Lane, her court services officer and case worker respectively, that it was not Loudner, but rather "some cousins" who raped her in 1992. As a result of a communication mix-up and/or breakdown in the investigative process, R.A. was not interviewed about her recantation until January, 1999. At that time, she reaffirmed that Loudner was innocent and that someone else had raped her. On March 23, 1999, R.A. wrote a letter to Ashley/Ross, again recanting her trial testimony and her identification of Loudner as her perpetrator, saying instead that her cousin, Raynard Bad Moccasin, and "a few other cousins" were the ones who had raped her.

[¶ 14]She echoed her earlier recantations in a signed affidavit dated March 20, 2000, and in an interview with Alexandra Asbury, an agent with the Federal Bureau of Investigation (FBI), on May 24, 2000. When asked by Asbury why she had lied in court about Loudner being the one who had sexually abused her, R.A. remarked that she made up the story to get her other male relatives to stop "bothering" her (i.e., touching her in a sexual way). R.A. was subsequently interviewed on two separate occasions in October, 2000 and "took back" her recantations during her conversations with federal investigating authorities. At the November 2, 2000 evidentiary hearing, R.A. testified that Loudner was not the one who had raped her and that her trial testimony to the contrary was not the truth.

[¶ 15]In his § 2255 motion, Loudner claims that R.A.'s recantations constitute newly-discovered evidence that demonstrates he was "actually innocent" of the sexual contact offenses he was convicted of and requests that his convictions be vacated and that he be released, or at a minimum, granted a new trial. Plaintiff, United States of America (government) counters that Loudner's motion should be dismissed on mootness grounds or because it has no merit based on settled federal precedent.

## IV.

### A.

[¶ 16]The government challenges the timeliness of Loudner's motion, arguing that the same was filed too late.

[¶ 17]Section 2255 contains a one-year limitations period for filing motions under that section.[3] This 1-year time limit became effective April 24, 1996, with the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. 104–132, Title I, § 105, 110 Stat. 1220. Federal defendants whose convictions became final before the enactment of

---

**3.** § 2255 provides in pertinent part as follows:

A 1-year period of limitations shall apply to a motion under this section. The limitation period shall run from the latest of—

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

the AEDPA were given a 1–year grace period from its effective date (i.e., until April 24, 1997) to file their § 2255 motions. *Moore v. United States,* 173 F.3d 1131, 1133, 1135–36 (8th Cir.1999).

### B.

[¶ 18]Here, Loudner's conviction became "final" in September, 1993, 1993, the expiration of the time period for filing a petition for a writ of certiorari before the United States Supreme Court. *See Smith v. Bowersox,* 159 F.3d 345, 347–48 (8th Cir.1998), *cert. denied,* 525 U.S. 1187, 119 S.Ct. 1133, 143 L.Ed.2d 126 (1999) (rejecting state's argument that AEDPA's phrase "conclusion of direct review" refers to "conclusion of state court review", and holding instead that running of statute of limitations is triggered by either (i) the conclusion of all direct criminal appeals in the state system, followed by either completion or denial of certiorari proceedings before the United States Supreme Court, or (ii) if certiorari was not sought, then by the conclusion of all direct criminal appeals in the state system followed by the expiration of the time allotted for filing a petition for a writ: "there is a well-established body of federal case law that interprets the phrase 'final by the conclusion of direct review' to include an opportunity to seek certiorari ... [and][w]hen Congress elects to use terminology that has become commonplace in court decisions in a particular field of law, the rules of statutory construction call for us to define the statute's terms in harmony with that accepted judicial meaning"); *see also, Snow v. Ault,* 238 F.3d 1033 (8th Cir.2001) (reaffirming the rule in *Smith* and holding that the limitations period is not tolled for the 90 days during which certiorari could have been brought); *Kapral v. United States,* 166 F.3d 565 (3d Cir.1999) ("while the term 'direct review' is not defined ..., it is axiomatic that direct review of state court criminal judgment includes the right to

seek certiorari review in the United States Supreme Court.... Therefore, a state court criminal judgment is 'final' (for purposes of collateral attack) at the conclusion of review in the United States Supreme Court or when the time for seeking certiorari review expires.... [A] judgment likewise becomes 'final' within the meaning of § 2255 only when direct review in the United States Supreme Court has concluded").

[¶ 19]Loudner thus had an opportunity to file a § 2255 motion within the 1–year grace period between April 24, 1996 and April 24, 1997, but did not do so. Consequently, his motion is now only timely if the limitations period began to run from a date other than the date in which he was convicted. Loudner does not allege that he falls within the purview of either § 2255(2) or (3). Instead, he contends that the beginning date of the applicable 1–year limitations period should be re-set to March 23, 1999, when in a letter to Ashley/Ross, R.A. disavowed her trial testimony and said that he was not the one who had sexual contact with her. Because his motion was filed within one year of this date, Loudner maintains that the motion was timely and is properly before the Court for adjudication.

### C.

[¶ 20] "Section 2255(4) is not a tolling provision that extends the length of the available filing time by excluding certain periods that post-date the start of the limitations clock from the calculation of how much time has run. Rather, it resets the limitations period's beginning date, moving it from the time when the conviction became final, *see* § 2255(1), to the later date on which the particular claim accrued." *Wims v. United States,* 225 F.3d 186, 190 (2d Cir.2000).

[¶ 21]The proper task in a case such as this one is to determine when a duly

diligent defendant in Loudner's circumstances would have discovered R.A.'s recantation.[4] After a discovery date has been pinpointed, the defendant must file his motion within one year of that date.

[¶ 22]The "due diligence" requirement should be considered in light of the totality of the circumstances present including the defendant's confinement in prison and any special restrictions that incarceration may impose.[5] *Wims*, 225 F.3d at 190; *Easterwood v. Champion*, 213 F.3d 1321, 1323 (10th Cir.2000). This requirement applies to those who could not discover the facts supporting the claims, not those who "sleep on their rights." *See Fisher v. Johnson*, 174 F.3d 710, 715 & n. 14 (5th Cir.1999), *cert. denied*, 531 U.S. 1164, 121 S.Ct. 1124, 148 L.Ed.2d 991 (2001). The requirement though does not convey a statutory right to an extended delay while the defendant gathers every possible scrap of evidence that might, by negative implication, support his claim. *See Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir.1998).

### D.

[¶ 23]In the instant case, Loudner could not have reasonably discovered R.A.'s recantations any earlier than March 23, 1999. He had no knowledge whatsoever that R.A. had recanted her trial testimony until some time after this date when he was apprised of the letter she wrote to Ashley/Ross. Nor did he have the ability and/or connections, prior to this date, to learn about or obtain information on R.A.'s January 13, 1997 recantation to Williams and Layne or statements she made to investigating authorities two years later. Instead, the record reveals that Loudner became aware of R.A.'s recantation shortly after the March 23, 1999 letter was delivered to Ashley/Ross and assiduously proceeded, in less than a year, to verify and record her statements and incorporate them into his § 2255 motion and "actual innocence" claim.

[¶ 24]The government contends that Loudner could have discovered, through the exercise of due diligence, the "factual predicate" for his "actual innocence" claim at or shortly after the trial was held in the summer of 1992. In support of its contention, the government points to certain testimony, offered by Walking Eagle on July 16, 1992, wherein she testified that the sex acts charged were perpetrated by someone other than Loudner:

[On direct examination by defense counsel]:

Q. Did there come a time between then and now that [R.A.] had talked with you about the allegations herein?

---

4. The fact that it may have been *possible* for someone to know or to have found out about R.A.'s recantation prior to March 23, 1999, is not dispositive. Section 4 of the statute does not require that a person exercise maximum feasible diligence, but rather only "due" or "reasonable" diligence. *See Wims*, 225 F.3d at 190, n. 4.

5. The phrase "due diligence" is not defined in § 2255 or anywhere in the AEDPA. In construing and applying this phrase, courts appear to require that the defendant show some kind of measure of prudence, activities or assiduity as may be properly expected from and ordinarily exercised by a reasonable and prudent person under the particular circumstances present. *Wims*, 225 F.3d at 189–91; *United States v. Zuno–Arce*, 25 F.Supp.2d 1087, 1097–98, 1110–13 (C.D.Cal.1998), *aff'd*, 209 F.3d 1095, 1098, 1102–03 (9th Cir.2000); *Balagula v. United States*, 73 F.Supp.2d 287, 290–91 (E.D.N.Y.1999); *Fraser v. United States*, 47 F.Supp.2d 629, 630 (D.Md.), *appeal dismissed*, 188 F.3d 504 (4th Cir.1999); *Lewis v. United States*, 985 F.Supp. 654, 657 (S.D.W.Va.1997); *see also, United States v. Cook*, 105 F.Supp.2d 1013, 1014–15 (E.D.Wis. 2000) (the express tolling provision found in § 2255(4) is no broader than the equitable tolling doctrine).

A. Yes.

Q. When did that occur?

A. About the end of March.

Q. And where would it occur at?

A. At my place.

Q. And was there anybody in the home besides you, and [R.A.] and the children?

A. No.

Q. Would you tell the jury what she told you?

A. We were just talking and she said, "Lynnette [Walking Eagle], it wasn't Royce [Loudner], it was someone else." I just said, "Oh", and I walked away.

Q. Have you ever attempted to inquire about these allegations of her?

A. No, uh-unh.

T.Tr. 343. Two days earlier, however, R.A. described what Loudner did to her at Walking Eagle's home and the tribal hall in testimony and through a diagram that she drew for the jury. Her version of what happened was corroborated by other witnesses, including Dr. Jones and Pier as well as a note that R.A. herself wrote implicating Loudner. On this record, the Court cannot say that Loudner, had he exercised the requisite due diligence, would have discovered the facts necessary to support his "actual innocence" claim until March 23, 1999, at the earliest.[6] Accordingly, Loudner's motion, which was filed within one year of the date of R.A.'s recantation letter to Ashley/Ross, is not time-barred and/or subject to dismissal on limitations grounds.

## V.

### A.

[¶ 25]Having determined that his § 2255 motion is timely, the Court will turn now to Loudner's "actual innocence" claim.

[¶ 26]A claim of "actual innocence" is not itself a constitutional claim but instead a gateway a defendant must pass through to have the merits of an otherwise barred constitutional claim considered on collateral review. *Schlup v. Delo*, 513 U.S. 298, 315, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Herrera v. Collins*, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993).[7]

---

**6.** On several occasions at trial, Loudner's trial counsel attempted to solicit admissions from R.A. that she was lying about who sexually molested her, but she steadfastly maintained that she was telling the truth and that Loudner was the culprit.

**7.** In *Schlup*, the Supreme Court distinguished between "gateway" and "substantive" claims of actual innocence. In contrasting these two claims, the Court observed as follows:

As a preliminary matter, it is important to explain the difference between *Schlup's* claim of actual innocence and the claim of actual innocence asserted in *Herrera* [.] In *Herrera*, the petitioner advanced his claim of innocence to support a novel substantive constitutional claim, namely, that the execution of an innocent person would violate the Eighth Amendment. Under petitioner's theory in *Herrera*, even if the proceedings that had resulted in his conviction and sentence were entirely fair and error free, his innocence would render his execution a "constitutionally intolerable event."

*Schlup's* claim of innocence, on the other hand, is procedural rather than substantive. His constitutional claims are based not on his innocence, but rather on his contention that the ineffectiveness of his counsel and the withholding of evidence by the prosecution denied him the full panoply of protections afforded to criminal defendants by the Constitution. *Schlup*, however, faces procedural obstacles that he must overcome before a federal court may address the merits of those constitutional claims. Because *Schlup* has been unable to establish "cause and prejudice" sufficient to excuse his failure to present his evidence in support of his federal petition, *Schlup* may obtain review of his constitutional claims only if he falls within the "narrow class of cases ... implicating a fundamental miscarriage of jus-

" 'Actual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States,* 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998); *see also, Sawyer v. Whitley,* 505 U.S. 333, 339, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). Claims of "actual innocence" are rarely successful and require the defendant to overcome an exacting burden. *Schlup,* 513 U.S. at 324, 327, 115 S.Ct. 851; *United States v. Lurie,* 207 F.3d 1075,

tice[.] *Schlup's* claim of innocence is offered only to bring him within this "narrow class of cases."

*Schlup's* claim thus differs in at least two important ways from that presented in *Herrera.* First, *Schlup's* claim of innocence does not by itself provide a basis for relief. Instead, his claim for relief depends critically on the validity of his *Strickland* and *Brady* claims. *Schlup's* claim of innocence is thus "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise-barred constitutional claim considered on the merits."

More importantly, a court's assumptions about the validity of the proceedings that resulted in conviction are fundamentally different in *Schlup's* case than in *Herrera's.* In *Herrera,* petitioner's claim was evaluated on the assumption that the trial that resulted in his conviction had been error free. In such a case, where a petitioner has been "tried before a jury of his peers, with the full panoply of protections that our Constitution affords criminal defendants," it is appropriate to apply a "extraordinarily high" standard of review[.]

*Schlup,* in contrast, accompanies his claim of innocence with an assertion of constitutional error at trial. For that reason, *Schlup's* conviction may not be entitled to the same degree of respect as one, such as *Herrera's,* that is the product of an error free trial. Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim. However, if a petitioner such as *Schlup* presents evidence of innocence so strong that a court cannot have confidence in the outcome of a trial unless the court is also satisfied that the trial was free of non-harmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

Consequently, *Schlup's* evidence of innocence need carry less of a burden. In *Herrera,* (on the assumption that petitioner's claim was, in principal, legally founded), the evidence of innocence would have had to be strong enough to make his execution "constitutionally intolerable" *even if* his conviction was the product of a fair trial. For *Schlup,* the evidence must establish sufficient doubt to justify the conclusion that his execution would be a miscarriage of justice *unless* his conviction was the product of a fair trial.

... If there were no question about the fairness of the criminal trial, a *Herrera*-type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish *Schlup's* innocence. On the other hand, if the habeas court were merely convinced that those new facts raise sufficient doubt about *Schlup's* guilt to undermine the confidence in the result of the trial without the assurance that that trial was untainted by constitutional error, *Schlup's* threshold showing of innocence would justify a review of the merits of the constitutional claims.

*Schlup,* 513 U.S. at 313–17, 115 S.Ct. 851.

Here, Loudner has raised a *Schlup* gateway claim seeking relief premised not on his actual innocence (as was the case in *Herrera* ) but rather on an unconstitutional trial. Specifically, he alleges that he was wrongfully convicted and thereby denied his right to a fair trial because the jury returned guilty verdicts that were based on the perjured testimony of R.A. As such, Loudner's convictions may not carry the same reverence as ones that result from a trial devoid of error. *Schlup,* 513 U.S. at 315, 115 S.Ct. 851. To gain gateway passage and obtain review of his constitutional claims, Loudner must present newly-discovered evidence that is reliable and sufficiently probative to undermine the jury's verdict and the constitutional fairness of his trial as a whole. *Id.* at 316–17, 324, 327–28, 331–32; *see also, Amrine v. Bowersox,* 128 F.3d 1222, 1226–30 (8th Cir.1997) (*en banc* ), *cert. denied,* 523 U.S. 1123, 118 S.Ct. 1807, 140 L.Ed.2d 946 (1998) (*Amrine I* ).

1077 n. 4 (8th Cir.2000); *see also, United States v. Apker,* 174 F.3d 934, 938–39 (8th Cir.1999). To prevail on such a claim, the defendant must produce "new reliable evidence ... not presented at trial" and "show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup,* 513 U.S. at 324, 327, 115 S.Ct. 851;[8] *Amrine v. Bowersox,* 238 F.3d 1023, 1026 (8th Cir.2001) (*Amrine II*); *Johnson v. Norris,* 170 F.3d 816, 817–18 (8th Cir.1999); *see also, Bousley,* 523 U.S. at 623, 118 S.Ct. 1604.

[¶ 27]"[E]vidence is [']new['] only if it was not available at trial and could not have been discovered earlier through the exercise of due diligence." *Johnson,* 170 F.3d at 818; *Amrine I,* 128 F.3d at 1230. A defendant can make the required "new evidence" showing where, for example, the factual basis for the evidence he relies on did not exist at the time of trial and could not have been presented earlier, *see Bragg v. State,* CR 96–820, 2000 WL 123615, at *13–15 (E.D.Ark. Dec. 8, 2000), or where it is shown that a witness would not have testified at trial the same way that she did at the evidentiary hearing had she been asked the right questions, *see and compare, Johnson,* 170 F.3d at 818. The evidence must not only be "new" but also "reliable". *Schlup,* 513 U.S. at 324, 115 S.Ct. 851; *Amrine I,* 128 F.3d at 1228, 1230. If new evidence calls into question the credibility of the witness at trial, the reviewing court may itself have to make credibility evaluations. *Schlup,* 513 U.S. at 328–30, 115 S.Ct. 851; *Amrine I,* 128 F.3d at 1228, 1230. An actual innocence inquiry is necessarily fact-intensive and requires the court to assess the reliability of the new evidence and determine whether it is more likely than not that no reasonable jury would have found the defendant guilty in light of the same. *Schlup,* 513 U.S. at 327–32, 115 S.Ct. 851; *Amrine I,* 128 F.3d at 1228. The standard for gateway passage can be met even if the trial record contains sufficient evidence to support the jury's verdict because the court must assess the credibility and "probative force" of the new evidence with what was produced at trial and make a probabilistic adjudication of what reasonable, properly instructed, triers of fact would have likely done. *Schlup,* 513 U.S. at 329–32, 115 S.Ct. 851; *Amrine I,* 128 F.3d at 1228.

### B.

[¶ 28]Loudner has come forward with evidence not previously available which, if believed, directly contradicts key evidence offered against him at trial. He now has a sworn recantation by R.A., the victim, who maintains that he was not the one who sexually accosted her.[9] Such evidence did not come to light until well after the trial. Given Loudner's continued incarceration, R.A.'s various placements between 1995 and 2000 and the manner and context within which the recantations were made and followed up on, it cannot be said that Loudner could or should have discov-

---

**8.** Although *Schlup* was a guilt phase death penalty case, the Eighth Circuit has made it clear that the standard enunciated in *Schlup* applies to guilt phase *non-capital* cases as well. *See, e.g., Weeks v. Bowersox,* 119 F.3d 1342, 1350 (8th Cir.1997) (*en banc*), *cert. denied,* 522 U.S. 1093, 118 S.Ct. 887, 139 L.Ed.2d 874 (1998).

**9.** While it is not altogether clear, especially in view of R.A.'s alternating identifications as to

who her perpetrator(s) really was, the Court is satisfied, based on her responses to the Court's own questions, that she would have probably testified differently at trial than she originally did. Whether a reasonable jury would have likely believed her augmented testimony and in particular her recantations, is, as explained later herein, an entirely different matter.

ered these exculpatory revelations, by being more diligent, any earlier than he did. The Court, thus, concludes that the evidence was "newly discovered".

## C.

[¶ 29]The Court, however, is unable to find that the recantation evidence is "reliable" and as such conclude that Loudner has made the threshold showing of innocence, as required by *Schlup* and its progeny to warrant a review of his constitutional claims. The Court vigilantly watched and listened to R.A. while she testified at the evidentiary hearing, paying particular attention to her nonverbal expressions and the manner, promptness and candor with which she responded to questions. After a lengthy and detailed mental assessment of R.A.'s spoken word and overall demeanor during the hearing, the Court finds that she was not a credible witness and that her testimony was unreliable and lacked any indicia of trustworthiness. *See Amrine II*, 238 F.3d at 1026–27 (after considering the proffered newly discovered evidence, the district court found that a witness was not credible and that his recantation could not be relied upon; the court clearly explained its reasons for finding that the testimony was not reliable and this credibility determination is entitled to great deference).

[¶ 30]At the outset, R.A., barely an adult now, is currently in prison, having been twice convicted of grand theft. As a child, she was housed in various facilities for acts of juvenile delinquency and hospitalized on two occasions for mental problems. She appeared to be intimidated by the two dozen or so family members of Loudner's who were in the courtroom when she testified. Her testimony was inconsistent, equivocal and at times not in tune with her body language. She was unable to explain why she had lied so many times about who her transgressor really was. The fact that she would periodically take four to five seconds before answering a question also affected the probity of her testimony.

[¶ 31]Aside from this subtleties, there is a plethora of other evidence that casts serious aspersions on the believability of R.A.'s recantations. While in treatment with state authorities, R.A. continued to maintain that Loudner was her sexual perpetrator. It was not until January 13, 1997, almost two years after beginning treatment, that R.A. recanted her trial testimony and averred that Loudner was not the one who had sexual contact with her.

[¶ 32]Significantly, just before her recantation, R.A. received letters from Beatrice Whiting, defendant's mother, and from Ken Ross, her (R.A.'s) stepfather. R.A. remembered references in Whiting's letter to some family members "put[ting her] up to it" (*i.e.*, telling her to lie at trial) and to Whiting saying that she still believed Loudner was innocent. She likewise remembered Whiting begging her in the letter to change her story "so that Loudner could get out [of prison]." Whiting's letter caused R.A. to be concerned about Ashley/Ross's safety and upset R.A. enough that she went and talked to Williams and Layne and told them that Loudner did not sexually abuse her.

[¶ 33]In the meantime, but prior to recanting, R.A. received a letter from Ross wherein he mentioned problems Ashley/Ross was having with Walking Eagle who, by that time, had moved next door to Ashley/Ross. According to R.A., Ross indicated in his letter that Walking Eagle was "threatening" Ashley/Ross and that because of this, Ashley/Ross was "having a hard time". Ross's letter suggested that R.A. help Ashley/Ross out by taking back what she had testified to at trial. Ironically, R.A. contends that Ross molested she and her sisters about the same time as the allegations involving Loudner surfaced.

[¶ 34]It did not take long for R.A. to recant her recantation. Within an hour after tell-

ing Williams and Layne that Loudner was innocent, R.A. "took it back".

[¶ 35]Subsequently, on October 23, 1998, Whiting again wrote R.A., pleading her to tell the truth and promising that "[t]his will be just between you and me and my Lawler". In her letter, Whiting mentioned that Loudner had been "locked up now for seven years" and still maintained "that he did not do anything." Whiting further indicated in the letter that R.A. was probably "put up to this" by a jealous family member. Whiting concluded her letter with the following declaration/question: "I believe [Loudner] has suffered enough now, don't you?"

[¶ 36]In January, 1999, R.A. was interviewed by Asbury in Redfield. At that time, R.A. advised Asbury that Loudner was innocent of the charges. Two months later, on March 23, 1999, R.A. wrote a letter to Ashley/Ross, again recanting her trial testimony and naming Raynard Bad Moccasin, a cousin of hers, and "a few other cousins" as the wrongdoers.

[¶ 37]On March 20, 2000, R.A. executed an affidavit prepared by Loudner's counsel, wherein she stated that Loudner did not rape her in 1992 and that she lied and committed perjury when she testified to the contrary at trial. R.A., however, admitted that she did not read the affidavit before she signed it but rather "just looked it over". She also acknowledged that she wanted to help Loudner out so that Walking Eagle would stop bothering Ashley/Ross.

[¶ 38]R.A. was again interviewed by Asbury during the latter part of May, 2000. At that time, she reiterated that she had lied about Loudner sexually abusing her and fabricated a story to get other male relatives of hers to "stop bothering" her (*i.e.*, touching her in a sexual way).

[¶ 39]In early October, 2000, R.A. met with and talked to Mikal Hanson, the Assistant United States Attorney who prosecuted the case against Loudner in 1992, and Marlys Pecora, a victim/witness specialist, at the Womens' Prison in Pierre. During the visit, R.A. insisted that her trial testimony was true. When questioned again eleven days later by FBI agents, she reaffirmed the veracity of what she testified to at trial. She confessed to recanting her testimony but advised agents that she did so because she was concerned about Ashley/Ross (who she thought was being threatened) and because she was angry about certain allegations made by her aunt.

[¶ 40]At the evidentiary hearing, R.A. testified that she did not tell the truth in court eight years earlier and maintained that Loudner was not the one who had violated her. She admitted, however, that she had lied many times since the trial about who had raped her. When asked why she had continued to lie, R.A. remarked that she was "not going to say". Quite telling was the threat, whether subliminal or real, she perceived was being made by Loudner and his family against Ashley/Ross and herself. It was readily apparent that R.A. was concerned about Walking Eagle continuing to harass Ashley/Ross and that R.A. was daunted by Loudner and his family, in front of whom she had to appear and testify.

[¶ 41]Most troubling, though, was R.A.'s vacillation, back and forth, as to the truthfulness and accuracy of her original trial testimony. She has recanted and then "taken back" her recantations so many times that the Court is unsure whether she knows and is willing to say what the truth really is. The Court had a hard time believing anything R.A. said and is confident that a reasonable jury would not accept her recantations because of the historical facts surrounding them and her own lack of credibility.

[¶ 42]These and other factors, when combined together, show that R.A. was a witness with no credibility whose testimony was unreliable and anything but trustworthy. The recantation evidence offered by Loudner, therefore, is unworthy of belief and does not satisfy the reliability component of the *Schlup* "actual innocence" test.

[¶ 43]Inasmuch as Loudner has filed to support his constitutional claims with evidence having the reliability necessary to justify further review, there is no need to address the "probative force" prong of the *Schlup* test.

### D.

[18] [¶ 44]Yet, even assuming, *arguendo*, that the recantation evidence is "new" and "reliable", the Court is nonetheless unable to conclude that, in light of such evidence, it is more likely than not that no reasonable juror would have found Loudner guilty of the charged offenses beyond a reasonable doubt. *Schlup*, 513 U.S. at 327–31, 115 S.Ct. 851. Nor is the Court able to conclude, in view of the overwhelming credibility problems that exist with respect to R.A.'s recantations, that this is one of those "extraordinary" cases contemplated by *Schlup* for gateway passage.

[¶ 45]When considering whether "new evidence", in the form of a witness's recantation, would probably result in an acquittal, credibility is of utmost importance:

> The real question [as to credibility], we suppose, is not whether the district judge believed the recantation, but how likely the district judge thought a jury at a second trial would be to believe it. The finding that the witness is not credible, however, at least in the context of this case, appears to us to cover both these bases. Indeed, if a district court does not believe a witness, it seems most unlikely that the same court would find the witness sufficiently persuasive to enable the court to say that the witness's testimony would probably produce an acquittal at a new trial. . . .

> It is true, as appellants stress, that [the recanting witness's] testimony at trial was the only direct evidence of their guilt of [the offense charged]. His recantation, accordingly, is undeniably material and important. Still, if the recantation is not believable, it can hardly be said that it would probably produce a verdict of acquittal at a new trial. It is almost impossible for an appellate court to hold that a district judge's rejection, on credibility grounds, of the testimony of a live witness is clearly erroneous, and we have no disposition to do so here. . . .

*United States v. Grey Bear*, 116 F.3d 349, 350–51 (8th Cir.1997); *see also, United States v. Provost*, 969 F.2d 617, 620 (8th Cir.1992) (probability that a recantation would lead to acquittal "rests in large part on the credibility of the recantation"), *cert. denied*, 506 U.S. 1056, 113 S.Ct. 986, 122 L.Ed.2d 139 (1993).

[¶ 46]Simply put, neither R.A. nor her testimony was credible.[10] It is therefore very unlikely that her recantations would have been believed and would have resulted in Loudner being acquitted on all counts. *See Amrine II*, 238 F.3d at 1026–27; *United States v. Papajohn*, 212 F.3d 1112, 1117–18 (8th Cir.2000);[11] *see also, Hanki-*

---

**10.** In making its credibility determination, the Court has considered a myriad of factors, including those set forth in applicable Eighth Circuit case law and jury instructions. *See United States v. Merrival*, 600 F.2d 717, 719 (8th Cir.1979); *United States v. Phillips*, 522 F.2d 388, 391 (8th Cir.1975); *Clark v. United States*, 391 F.2d 57, 60 (8th Cir.), *cert. denied*, 393 U.S. 873, 89 S.Ct. 165, 21 L.Ed.2d 143 (1968); Eighth Circuit Manual of Model Jury Instructions: Criminal Instruction 3.04 (2000) and cases cited therein.

**11.** For an excellent discussion of the recantation/credibility issue, *see United States v.*

*son v. Bd. Of Prison Terms,* 768 F.Supp. 720, 722–25 (C.D.Cal.1991). The reason is obvious. Recanted testimony is viewed with skepticism because a child who makes subsequent statements directly contradicting her earlier testimony "either is lying now, was lying then, or lied both times." *Provost,* 969 F.2d at 620 (*citing United States v. Bednar,* 776 F.2d 236, 238–39 (8th Cir.1985)). This skepticism is heightened in child sexual abuse cases where family members of both the child victim and the defendant are involved, the child has feelings of guilt and is pressured to change her story. *United States v. Miner,* 131 F.3d 1271, 1273–74 (8th Cir.1997); *Provost,* 969 F.2d at 621. The same skepticism, when applied in Loudner's case, would have had a profound effect on the credibility of R.A. and her recantation testimony and on the likelihood that a jury would have acquitted him of the three sex offenses.

[¶ 47]Indeed, it must be remembered that R.A.'s trial testimony was corroborated by her own letter, written three days after the sex acts charged in Counts I and II occurred, and by her statements to Dr. Jones and to Pier. In the face of all that has happened to her in the last eight and one-half years, R.A. would have had a difficult, if not an impossible, task of persuading a jury that her prior written and spoken words were all lies that she fabricated to protect one or more other persons.

[¶ 48]While there is a *possibility* that twelve reasonably-minded jurors, presented with the recantation evidence, would have found Loudner not guilty beyond a reasonable doubt, the *probability* that they would have done so is, in the Court's judgment, almost nonexistent. Stated another way, it is highly doubtful that a jury would have believed R.A.'s recantation testimony

and decided not to convict him because of it. This being the case, the "new evidence" presented by Loudner is insufficient to make out a gateway claim of actual innocence under *Schlup,* let alone the more exacting standard for a substantive claim of actual innocence. *Schlup,* 513 U.S. at 316–17, 115 S.Ct. 851; *Amrine II,* at 1026–27. Accordingly, Loudner is foreclosed from prevailing on his constitutional claims, premised on his "actual innocence," or from obtaining § 2255 relief.

**E.**

[¶ 49]The Court is mindful of the Eighth Circuit's decision in *Lewis v. Erickson,* 946 F.2d 1361 (8th Cir.1991). *Lewis,* a § 2254 case decided before *Schlup,* is distinguishable from the case at hand in a number of respects. First, the victim's recantation in *Lewis* was credible and worthy of belief. By contrast, R.A. and her testimony were contradictory, untrustworthy and not reliable at all. Second, the victim in *Lewis* was an adult who recanted before the codefendant's trial could even begin, not 4–1/2 to 6–1/2 years after her original trial testimony. Third, unlike the case at bar, there were serious credibility problems in *Lewis* with the victim's original testimony, including the victim's intoxicated state at the time of the attack. Finally, the *Lewis* victim's recantation was not influenced by pressure from anyone or by any other factors, something that cannot be said about R.A.'s recantations or her most recent testimony. For many of the same reasons articulated in *Provost,* 969 F.2d at 622, *Lewis* does not control here.

**CONCLUSION**

[¶ 50]Upon due consideration of the record and applicable law, the Court is convinced

---

*Earles,* 983 F.Supp. 1236, 1248–58 (N.D.Iowa 1997) (opinion of trial court in *Papajohn* ),

*appeal dismissed* 162 F.3d 1165 (8th Cir. 1998).

that Loudner is not entitled to relief under § 2255 and that his motion should be dismissed in its entirety. Accordingly, based on the foregoing findings of fact and legal discussion and pursuant to 28 U.S.C. § 636(b) and Rule 8(b) of the Rules Governing § 2255 Proceedings, it is hereby [¶ 51]RECOMMENDED that Loudner's Motion To Vacate, Set Aside Or Correct Sentence By A Person In Federal Custody, Docket No. 98, be DENIED in all respects that the case be DISMISSED with prejudice.

Feb. 26, 2001.